**BANK OF AMERICA, FSB, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 95–660C, 95–797C.**

United States Court of Federal Claims.

March 21, 2003.

---

77. Pl.'s Rep. at 16.

78. Def.'s Opp'n at 36.

79. Pl.'s Rep. at 16–17.

Steven S. Rosenthal, Holland & Knight LLP, Washington, D.C., attorney of record for plaintiff Bank of America, FSB. Alan K. Palmer and Leo G. Rydzewski, Holland & Knight LLP, of counsel.

Melvin C. Garbow, Arnold & Porter, Washington, D.C., attorney of record for investor plaintiffs Beverly W. Thrall and Ray Doumani. Howard N. Cayne, David B. Bergman, and Michael A. Johnson, Arnold & Porter, Washington, D.C., of counsel.

Tonia J. Tornatore, with whom were Deputy Assistant Attorney General Stuart E. Schiffer, Director David M. Cohen, Deputy Director Jeanne E. Davidson, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant. Lee M. Straus, Commercial Litigation Branch, Civil Division, Department of Justice, of counsel.

## OPINION

WIESE, Judge.

Plaintiff Bank of America, Federal Savings Bank ("the Bank") is the successor in interest to H.F. Holdings, Inc. ("HFH"), a bank holding company, and Honolulu Federal Savings & Loan Association ("HonFed"), a thrift institution. The Bank is joined in this suit by Beverly W. Thrall (successor by operation of law to the claims of Larry B. Thrall) and Roy Doumani, members of the original investor group that formed HFH and acquired, through their investment in HFH, a majority ownership interest in HonFed.[1] In their respective complaints, plaintiffs assert that Congress's enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73,

---

1. The original investor group consisted of four individuals: William E. Simon, Sr., Gerald L. Parsky, Larry B. Thrall, and Roy Doumani, each of whom filed suit here in his individual capacity. William Simon and Gerald Parsky subsequently withdrew their actions, while Larry Thrall (now represented by his successor in interest, Beverly Thrall) and Roy Doumani have been permitted to join in the Bank's claim as intervenors pursuant to RCFC 17. For discussion of this issue, see *Bank of America, FSB v. United States*, 51 Fed.Cl. 500, 512–15 (2002).

103 Stat. 183 (codified as amended in various sections of 12 U.S.C.), deprived HonFed of valuable contract rights, specifically the promise by federal banking regulators that HonFed would not be subject to otherwise applicable capital adequacy requirements. Pursuant to this allegation, plaintiffs claim damages for breach of contract or, in the alternative, restitution or just compensation under the Fifth Amendment to the United States Constitution.

These consolidated cases are now before the court on defendant's motion to dismiss and on cross-motions for summary judgment addressing two basic issues. First is the question of liability: whether, on the basis of the parties' dealings, a contract was created between (i) HFH/HonFed and the Federal Home Loan Bank Board (the Bank Board), and/or (ii) the original investor group and the Bank Board. Second is the question of claim ownership: assuming the existence of a contract, who has standing to pursue a claim for its breach—HFH/HonFed, the investors, or both? The court, upon consideration of the parties' briefs and their oral arguments, has determined as follows: (i) a contract existed between HFH and the Bank Board; (ii) HonFed is a third-party beneficiary of that contract; and (iii) the investors are neither parties to the contract between HFH/HonFed and the Bank Board nor third-party beneficiaries of that contract.[2]

## FACTS

### A.

In 1986, a group of investors, led by the former Secretary of the Treasury, the late William E. Simon, Sr., approached the Bank Board about the possibility of acquiring HonFed, a then-failing thrift based in Honolulu,

Hawaii. Recognizing the need to recapitalize HonFed, the investors proposed a plan by which the thrift would be converted from a mutual association to a stock association, with its stock to be sold to raise capital for the resulting institution. The proposal additionally envisioned the creation of HFH, a holding company that was to be wholly owned by the investors and created for the sole purpose of acquiring the thrift. Finally, the proposal anticipated the issuance of approximately $35 million in subordinated debentures to further bolster the thrift's flagging capital levels.

The investors set forth the mechanics of their proposed acquisition in a draft application submitted to the Bank Board on April 24, 1986. In their application, the investors noted that the proposed transaction would require certain action on the part of the Bank Board, including that it "order or agree that for regulatory purposes [HonFed] shall be entitled to account for the Transaction under purchase accounting," with any excess of the fair value of liabilities over the fair value of assets to be "recorded as an intangible asset ('goodwill') which would be amortized over a period of 25 years using the straight-line method." Additionally, the application sought the Bank Board's prior approval to treat as regulatory capital the $35 million of subordinated debt that HonFed intended to issue.

On June 17, 1986, HFH, together with HonFed, submitted a formal application to the Bank Board seeking approval of the proposed restructuring and recapitalization of HonFed.[3] As part of that application, the investors made clear that the transaction was conditioned on the receipt from the Bank Board of certain assurances that were outlined in their draft application, including that

---

**2.** In the parties' view, the question of liability turns exclusively on whether or not a contract existed. The government offers no defense against a breach claim should the court find that a contract was indeed formed.

**3.** Under the Bank Board's regulations, a federally chartered mutual thrift institution generally is not permitted to sell a controlling interest in its stock issued upon conversion from a mutual corporation to a stock corporation. As an exception to this rule, the Bank Board's regulations permit a "voluntary supervisory conversion," i.e., the

sale of control of a converting mutual thrift institution when the Bank Board determines that "severe financial conditions exist that threaten the stability of the savings bank and that the voluntary supervisory conversion is likely to improve the financial condition of the savings bank." 12 C.F.R. § 563b.25(a) (1990). HonFed and HFH were required by law to obtain the Bank Board's approval for the conversion of HonFed and the acquisition of its capital stock by HFH.

HonFed be permitted to (i) account for the transaction under purchase accounting, (ii) record any excess of the fair value of liabilities over the fair value of assets as an intangible asset ("goodwill") to be amortized over a period of 25 years using the straight-line method, and (iii) include debentures in net worth for regulatory purposes—provisions that were to apply "regardless of any changes hereafter adopted in accounting principles for regulatory purposes." The application went on to make two additional requests: (i) that the $32.5 to $40 million of subordinated debt that HonFed intended to issue in connection with its restructuring be treated as regulatory capital; and (ii) that HonFed be "deemed ... in compliance with all regulatory net worth requirements and other regulations relating to net worth," so long as HonFed had a net worth equal to the lesser of either then-applicable net worth requirements or the amount required by its net worth plan.

In exchange for these concessions, the application provided that HFH would commit to infusing "up to an additional $2.5 million [in addition to the $17.5 million of paid-in capital contributed by the stock purchase] if at any point in time on or prior to December 31, 1995 [HonFed] fails to meet applicable net worth requirements, giving effect to forbearances granted relating thereto."

Following the Bank Board's receipt of the investors' conversion application, the supervisory agent principally responsible for overseeing HonFed's operations prepared a memorandum evaluating the terms of the proposed transaction. The supervisory agent identified as potential negatives the heavy reliance on borrowed capital ("[t]he capitalization ... following conversion involves substantial subordinated debt"); the limited nature of the net worth maintenance agreement ("[t]he holding company will provide only ... $2.5 million through 1995 and another $2.5 million during 1990"); the limited growth expected in future net worth ("net worth ... is not projected to increase at a rate necessary to meet the [Bank] Board's proposed six percent compliance schedule");

and the creation of goodwill, which was considered an encumbrance on income ("[t]he plan will result in the establishment of substantial goodwill which must be absorbed through income generation in future years").

Despite these drawbacks, however, the supervisory agent ultimately recommended the Bank Board's approval of the application. In support of this recommendation, the supervisory agent explained:

> Based upon prior shopping efforts [a reference to earlier efforts to attract a buyer for HonFed], it is apparent that, absent the subject proposal, resolution of the Honfed insolvency will otherwise involve a substantial level of assistance from the FSLIC [Federal Savings and Loan Insurance Corporation]. The proposed conversion/acquisition, which will be consummated at no cost to the Corporation, is not contemplated to result in any substantial increase of risk to the FSLIC. The addition of substantial private capital and improved management oversight to be provided [by] leading figures in the national financial arena should actually reduce risk to FSLIC, while allowing Honfed to once again become a viable thrift institution.

On August 29, 1986, the Bank Board adopted Resolution No. 86–910 approving HFH's application to acquire HonFed.[4] As part of that approval, the resolution specified that HonFed was to account for the acquisition in accordance with generally accepted accounting principles ("GAAP"), subject to the following exceptions "hereby approved by the [Bank] Board for purposes of regulatory reporting by Honfed to the [Bank] Board":

(a) push-down accounting shall be used to reflect the acquisition of Honfed on the books of Honfed;

(b) the value of any intangible assets resulting from the acquisition of Honfed shall be amortized by Honfed over a period of 25 years by the straight line method; and

(c) subordinated debt which is approved by the [Bank] Board as net worth for [Regulatory Accounting Principles].

4. On the same date that it authorized the acquisition of HonFed, the Bank Board also adopted

Resolution No. 86–909 authorizing the voluntary supervisory conversion of HonFed.

In addition to those accounting treatments, the resolution required that the existence and amount of any intangible assets on Hon-Fed's books at the date of acquisition, including goodwill, be certified by an independent public accountant. Further, the resolution called for a stipulation in writing by HFH that as long as it controls HonFed, HFH "will cause the net worth of Honfed to be maintained pursuant to the forbearance levels and [the Net Worth Plan] provided below," and, to the extent necessary, will infuse up to $2.5 million of additional equity through December 31, 1995 (supported by a letter of credit) and an additional $2.5 million in 1990 (supported by the written personal guarantees of the principals of HFH, the original investors).

Finally, the resolution recited that "the acquisition of Honfed [was] resolving a supervisory problem" and, thus, from the date of HFH's acquisition of HonFed until Hon-Fed's 1996 fiscal closing date, the Bank Board agreed "to forbear from initiating supervisory action against Honfed as a result of its failure to meet [regulatory] net worth requirements ... *provided* that Honfed maintains a net worth-to-total liabilities ratio" set forth in the net worth plan provided therein.

### B.

On August 9, 1989, Congress enacted FIRREA, directing, *inter alia,* the promulgation of regulations setting forth new minimum capital standards. The resulting regulations, issued by the Office of Thrift Supervision ("OTS") on November 6, 1989, provided that unidentifiable intangible assets, such as the goodwill arising from HFH's acquisition of HonFed, would have to be excluded when determining compliance with the statute's core capital requirements. The regulations additionally restricted HonFed's ability to include subordinated debt in regulatory capital.

Shortly after the promulgation of these regulations, OTS informed HonFed that, based on its quarterly financial report, Hon-Fed was in danger of failing one or more of the new capital requirements. Although HonFed objected to the conclusion that it was required to meet the more stringent

FIRREA capital requirements rather than the capital requirements set forth in Resolution No. 86–910, HonFed nonetheless took steps to bring itself into compliance with the new capital standards. Toward that end, HonFed conducted a private equity placement involving the sale of preferred stock to a Hawaiian charitable trust, the Kamehameha Schools, Bernice Pauahi Bishop Estate. As a result of that placement, HFH relinquished approximately 23 percent of its ownership stake in the thrift but raised an additional $45 million to be counted toward the thrift's regulatory capital.

### C.

HonFed continued operating under this shared ownership for an additional two years, but on October 10, 1991, BankAmerica Corporation and its wholly owned subsidiary, the Bank, acquired ownership and control of HFH and HonFed through the purchase of the outstanding shares of HonFed and HFH. Following this acquisition, both HonFed and HFH became wholly owned subsidiaries of the Bank. Within the next year, each entity was abolished, HonFed through a conversion of its shares into shares of the Bank and HFH through a liquidation and dissolution. It is on the basis of these transactions that the Bank now claims to stand as the successor in interest to the rights and interests of HonFed and HFH.

### DISCUSSION

*The Contract Issue*

#### A.

■ The Restatement (Second) of Contracts § 17(1) (1979) explains that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." More specifically, a contract is an agreement characterized by "an exchange of promises— through commitments to act or refrain from acting in a specified way—that are evidenced in a writing or are inferable from conduct." *Maher v. United States,* 314 F.3d 600, 603 (Fed.Cir.2002). Such promises generally are expressed in the form of an offer and acceptance, in which each promise serves as the

inducement for the other. *Shearon v. Boise Cascade Corp.*, 478 F.2d 1111, 1115 (8th Cir. 1973). Thus, the first question we address here is whether these requirements have been met—whether the dealings between the parties relating to the conversion of HonFed from a mutual corporation to a stock corporation and its subsequent acquisition by HFH were promissory in character. Upon considering both the language of the Bank Board's Resolution No. 86–910 and the negotiations that preceded that resolution, we conclude that they were.

■ In support of that determination, we turn first to the Bank Board resolution approving HFH's application to acquire HonFed, Resolution No. 86–910. As noted above, the resolution contained language granting HonFed the right to include, for regulatory capital purposes, over $100 million of supervisory goodwill (on an amortizable basis) and $40 million of subordinated debt issued in connection with the acquisition. Additionally, the resolution included language identifying the basic considerations underlying the grant of approval as follows:

> WHEREAS, the [Bank] Board has determined that the acquisition of Honfed is resolving a supervisory problem, for the purposes of the preceding conditions 5 and 6 [describing, respectively, a net worth maintenance requirement and a dividend payout limitation] for the Honfed acquisition, and for Honfed's compliance with the requirements of Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, from the date of [HFH's] acquisition of Honfed until Honfed's 1996 fiscal closing date, the [Bank] Board hereby agrees to forbear from initiating supervisory action against Honfed as a result of its failure to meet the net worth requirements of Section 563.13(b) *provided* that Honfed maintains a net worth-to-total liabilities ratio (as defined below) equal to, or greater than, the [listed schedule of specifically negotiated ratios].

Defendant construes this language as nothing more than an expression of regulatory policy. The recitals contained in the quoted language, however, clearly evidence a promissory exchange. The paragraph starts with an acknowledgment that the transaction under consideration, the acquisition of Honfed, is "resolving a supervisory problem"—a reference, of course, to the financial risk facing the government deposit insurance fund because of HonFed's impaired capital structure and its likelihood of failure. The text goes on to enumerate certain alternative capital standards HonFed has pledged to observe (a pledge that anticipates the proposed increase in HonFed's capital) and concludes by saying that so long as HonFed fulfills the specified capital standards, "the [Bank] Board ... agrees to forbear from initiating supervisory action against Honfed as a result of its failure to meet [otherwise applicable] net worth requirements" until HonFed's 1996 fiscal closing date.

These words unquestionably are words of commitment. In them, we find described both the circumstance that prompted the government to act (the need to resolve a supervisory concern) and the details of the bargain that was struck (the agreement, on the one hand, that HonFed shall adhere to certain modified capital standards, and the regulator's assurance, on the other hand, to honor those standards for a stated period.) Unless we read these as words of promissory engagement, the performances they contemplate could not be enforced by either party— an outcome not reasonably likely to have been intended. Considering the economic objectives that underlie these words and the formality of the document in which they appear, these words must be understood as prescribing a course of action to which both parties have assented to be bound when, as elsewhere specified in the Bank Board's resolution, the supervisory agent is provided with a certification from HFH "stating that the acquisition has been consummated in accordance with the provisions of all applicable laws and regulations, the subject application, *and this Resolution*" (emphasis added).[5]

---

5. Defendant raised the point at oral argument that by agreeing in Resolution No. 86–910 to forbear from enforcing capital standards, the Bank Board committed only to observing the particular net worth-to-total liabilities ratio itemized in the resolution and not to honoring the accounting procedures, *i.e.*, the counting of goodwill and subordinated debt toward regulatory

Next, we turn to the negotiations that preceded the resolution. Any doubt one might have as to the promissory character of the undertakings memorialized in the Bank Board's resolution is dispelled by considering the pre-resolution dealings between the parties. Two themes dominate. First is the banking regulators' active interest in avoiding the costs to the government of a bank shutdown by finding a source of private capital to assist in HonFed's capital rehabilitation. Second is the private investors' interest in acquiring a capital-impaired banking institution with their own cash contributions leveraged by regulatory concessions. Each side fully understood the driving force of the other's position. In particular, as their deposition testimony reveals, the regulators understood that absent concessions regarding capital adequacy standards, there would be no deal. Given this point, it is not reasonable to argue that despite negotiations conducted in good faith, the representation recorded in Resolution No. 86–910—that "the [Bank] Board hereby agrees to forbear"—does not have the force of a promise behind it. To make sense from both sides' points of view, the transaction required a degree of predictability that only the enforceability of mutual promises could provide. Thus, we conclude that a contract existed between HFH and the Bank Board.

### B.

■ The contract between HFH and the Bank Board, however, is not restricted in its enforceability to those parties alone. The very purpose of the contract, from the investors' point of view, was to secure for HonFed

the benefit of special capital requirements, and because those requirements are specifically set forth in the contract as requirements the Bank Board had agreed to honor, the contract embodies a promise upon which HonFed is also entitled to sue. This result follows from the rule of contract law that treats the beneficiary of a promise as an intended beneficiary, that is, as one who may enforce the duty created by the promise "if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and ... the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Restatement (Second) of Contracts §§ 302(1), 304 ("the intended beneficiary may enforce the duty").

### C.

■ Having concluded that HFH and HonFed each have enforceable rights in the contract at issue, we now turn to the question of whether investors Larry Thrall (now represented by Beverly Thrall) and Roy Doumani may claim that they too contracted with the Bank Board and are therefore entitled, in their individual capacities, to pursue claims for breach of contract.

The investors contend that they may sue here for breach of contract because, they say, the same dealings that support the formation of a contract between HFH and the Bank Board also support the recognition of a contract between themselves and the Bank Board. In particular, the investors point out that they (i) initiated the negotiations with the Bank Board that led to the conversion and acquisition of HonFed, (ii) provided the

capital, relied upon to satisfy those net worth requirements. In other words, defendant argued that the language in the resolution authorizing HonFed to include "intangible assets" (supervisory goodwill) and "subordinated debt" as components of net worth "for purposes of regulatory reporting" was simply a declaration of then-existing regulatory policy rather than a commitment to honor such accounting treatments in the future.

Defendant's argument, however, is flatly inconsistent with the premise underlying the net worth maintenance agreement included in the resolution. The net worth maintenance agreement, pursuant to which HFH agreed to support scheduled net worth ratios by promising to in-

fuse "2.5 million ... if necessary through December 31, 1995, and an additional $2.5 million ... if necessary during 1990," makes sense only if it was intended to recognize the existence of a relatively constant net worth amount, i.e., an amount that continued to include supervisory goodwill and subordinated debt. Absent such a recognition, the promised infusion amounts would simply be arbitrary numbers lacking any relational economic justification. Indeed, were it not assumed that subordinated debt and supervisory goodwill were to remain components of net worth, then the looked-to infusion of an additional $2.5 million in back-up capital would fall far short of the amount that would be needed as replacement capital.

funding that was used to recapitalize Hon-Fed, and (iii) ultimately underwrote the deal by promising to guarantee the net worth of HonFed. In short, the investors claim to be the moving force behind HonFed's re-emergence as a viable banking institution and therefore must be counted among the Bank Board's contracting partners.

Although these factors accurately summarize the investors' role in the rehabilitation of HonFed, their recitation fails to tell the entire story. The key to both the transaction and its implications for the investors' contracting status is that the investors, in their dealings with the Bank Board, were not speaking for themselves but rather for their wholly owned corporation, HFH—a separate jural entity. The fact that the Bank Board recognized that it was contracting with HFH and not with the investors themselves is evident from Resolution No. 86–910. Specifically, the only obligation the resolution placed upon the individual investors was the requirement to stipulate in writing to their understanding of and their pledge to abide by the regulatory requirements concerning conflicts of interest and transactions with holding companies. This is a regulatory caution reasonably demanded of every owner of a bank holding company.

In all of its other aspects, however, it was HFH that the resolution named as the party obligated to carry out the promises that were to be undertaken for the benefit of HonFed. Indeed, even with respect to the investors' commitment to provide, if required, an additional $2.5 million in support of the net worth level of HonFed, the investors' obligation served only as a backup to HFH's own promise to provide such support: "[HFH] shall submit … the written personal guarantees of the principals of [HFH] for the … additional $2.5 million cash infusion." In response to that requirement, HFH provided FSLIC with a letter, signed by its Chief Executive Officer, agreeing that HFH would infuse both the $2.5 million backed by the letter of credit and the additional $2.5 million guaranteed by the investors. The fact that the latter obligation belonged to HFH is evident from the language preceding the investors' signatures: "The undersigned, constituting the sole stockholders of HFH, jointly and severally, guarantee *the obligation of HFH* set forth in the third paragraph hereof" (emphasis added).

Had the investors been regarded as contracting parties in their own right, the routing of their personal guarantees through HFH would have been unnecessary. Rather, in that instance, their promises would have been made to the Bank Board directly. Thus, the structure of the transaction stands as an acknowledgment that it was HFH through which the investors had chosen to speak and with which the Bank Board had elected to contract.

In an effort to persuade us otherwise, the investors cite several decisions of this court, which they claim affirm the principle that investors in a bank holding company (*i.e.,* shareholders) who provide financial guarantees in support of a *Winstar*-related transaction are deemed to be contracting parties who may sue for breach of contract. *See Franklin Fed. Sav. Bank v. United States,* 53 Fed.Cl. 690 (2002); *Southern Cal. Fed. Sav. & Loan Ass'n v. United States,* 52 Fed. Cl. 531 (2002); and *Bluebonnet Sav. Bank, FSB v. United States,* 47 Fed.Cl. 156 (2000), *rev'd,* 266 F.3d 1348 (Fed.Cir.2001).

We have considered these cases but do not find them supportive of investors' position. What these cases demonstrate is that in order for a shareholder to be considered a party to the underlying transaction, the shareholder's participation not only must be essential to the transaction, but also must be acknowledged in the form of a written promise, sought by and made directly to the government, that is formally recognized to constitute a part of the parties' overall undertaking.[6] As discussed above, the investors here do not meet those requirements.

---

6. To round out the discussion in the text, we provide a brief analytical summary of the cases relied upon by the investors in support of their claimed status as contracting parties. In the first case cited, *Franklin Federal,* 53 Fed.Cl. 690, the investors in a holding company were obliged by the terms of the regulators' approval letter (the letter approving the thrift's conversion to a stock corporation and its subsequent acquisition by the holding company) to agree in writing to pay, in

Although the position of the investors as guarantors of HFH's promise was important, it gave them no immediate stake in the transaction. Theirs was a secondary liability only. Further, the record contains no documents that would allow the court to declare that despite the secondary character of their obligation, the investors' participation as guarantors was intended to invest them with the status of contract parties. Rather, as we have already noted, the Bank Board's resolution reads to the contrary. Accordingly, the investors may only be regarded as ancillary participants in the transaction in question; their rights and obligations are therefore limited to the scope of their guarantee.

As a final argument, the investors claim that even if they do not qualify as direct contracting parties, they are, nevertheless, entitled to sue on the underlying contract because they hold the status of third-party beneficiaries under that contract. This, too, is an argument we cannot endorse.

As noted earlier in this opinion, contract law recognizes the right of a third party to sue for the enforcement of another's promise where it is clear that the contract was intended for the benefit of the third party and the recognition of a right to its enforcement by the third party is consistent with the promisee's intention. Restatement (Second) of Contracts §§ 302, 304. The investors cannot

satisfy these requirements. What has been identified in this opinion as the essential contract document, Bank Board Resolution No. 86–910, is bereft of any language demonstrating an intention to confer a benefit upon the investors. Granted, as the indirect owners of HonFed, the investors reasonably could have expected to profit from any growth that HonFed might achieve through the regulatory forbearances promised in the resolution. However, that expectation does not make them intended beneficiaries: "Third party beneficiary status is an 'exceptional privilege' and, to avail oneself of this exceptional privilege, a party must 'at least show that [the contract] was intended for his *direct* benefit.'" *Glass v. United States*, 258 F.3d 1349, 1354 (Fed.Cir.2001) (quoting *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912)). The investors do not meet this standard; only HonFed does.

*The Claim Ownership Interest*

At the outset of this opinion, we identified the issue of claim ownership as a potential second question to be addressed here. That issue was brought into focus because of the investors' contention that they were direct contracting parties whose complaints, as we initially read them, asserted entitlement to essentially the same damages being claimed by the Bank as successor in interest to the

the event the holding company could not, the $4.5 million indebtedness that the holding company had incurred to acquire the thrift's stock. In addition, the approval letter required both the shareholders and the holding company to agree, again in writing, to provide additional capital to Franklin Federal (the acquired institution) to ensure its compliance with minimum requirements. In rejecting defendant's contention that the shareholders lacked standing to sue (for lack of privity), the court relied on an integration clause that identified, as part of the parties' contract, "any understanding agreed to in writing by the parties." Hence, as signatories to both the required "Shareholder Agreement to Service Holding Company Debt" and the capital infusion agreement, the shareholders were deemed parties to a contract with the banking regulators.

The second case cited by the investors, *Southern California*, 52 Fed.Cl. 531, involved a regulatory capital maintenance agreement, signed by the shareholders of the holding company in their individual capacities, whereby they undertook to infuse up to an additional $5 million into the

acquired thrift if its capital fell below a certain level. The court identified this document as part of the overall contract and, hence, deemed the shareholders contracting parties in their own right because (i) the execution of the maintenance agreement was required as a condition of government assistance, and (ii) the contract documents included an integration clause that specifically adopted other contemporaneously executed documents (including the maintenance agreement) as part of the overall contract between the parties.

Finally, in the last case identified by the investors, *Bluebonnet Savings*, 47 Fed.Cl. 156, the sole shareholder of a holding company was held to be a contracting party because he was identified as such by the express terms of the capital maintenance agreement and had signed that document in his individual capacity thereby agreeing personally to infuse additional cash into the acquired thrift in the future.

In contrast to the situations presented in these cases, the investor shareholders before us never took on a front-line contractual responsibility. They chose, instead, to remain guarantors only.

claims of HonFed and HFH. Because, in the court's view, the transaction in question permitted only one recovery (assuming, of course, a contract were found to exist), then the resulting competition among claimants for that recovery would require this court's resolution. The investors have since clarified, however, that the recovery they seek—damages for the dilution of their ownership interest in HonFed resulting from the FIRREA-forced recapitalization of that institution—although still tied to the underlying transaction, is separate from and not duplicative of the damages being sought by the Bank. Nevertheless, the issue of claim ownership is now moot for a more basic reason: our determination that the investors are not contracting parties. Hence, they do not have standing to sue on the underlying contract. *Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 697, 1980 WL 13154 (1980) ("in order for a stockholder to sue for direct injuries, the wrong must amount to a breach of duty owed to the stockholder personally, and independently of his or her status as a stockholder").

CONCLUSION

For the reasons set forth above, the court directs the following with respect to the parties' pending motions:

*The Contract Issue*

1. Plaintiff Bank of America's motion for partial summary judgment on liability, filed June 3, 1998, is GRANTED.

2. Defendant's cross-motion for summary judgment on liability, filed June 3, 1998, is DENIED with respect to plaintiff Bank of America's claims and GRANTED with respect to the investors' claims.

3. Defendant's motion to dismiss and alternative motion for summary judgment on liability, filed October 10, 2000, is DENIED with respect to plaintiff Bank of America's claims and GRANTED with respect to the investors' claims.

4. The investors' motion for partial summary judgment on liability, filed October 19, 2000, is DENIED.

*The Claim Ownership Interest*

5. Defendant's motion for summary judgment, filed April 24, 2002, is GRANTED.

6. The investors' motion for summary judgment, filed April 24, 2002, is DENIED.

7. Plaintiff Bank of America's motion for summary judgment, filed May 7, 2002, is GRANTED.

Accordingly, there being no just reason for delay, the Clerk is directed to enter judgment pursuant to RCFC 54(b) dismissing the complaints of investor-plaintiffs Beverly W. Thrall (successor by operation of law to the claims of Larry B. Thrall) and Roy Doumani.