# United States Court of Appeals for the Federal Circuit

2006-5088, -5089, -5090

BANK OF AMERICA, FSB,

Plaintiff-Appellant,

v.

ROY DOUMANI and BEVERLY W. THRALL
(successor to the claims of Larry B. Thrall),

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Cross Appellant.

Alan K. Palmer, Kaye Scholer LLP, of Washington, DC, argued for plaintiff-appellant Bank of America, FSB. With him on the brief were Steven S. Rosenthal, Douglas A. Tucker, and J.D. Taliaferro.

Michael A. Johnson, Arnold & Porter LLP, of Washington, DC, argued for plaintiffs-appellants Roy Doumani and Beverly W. Thrall (successor to the claims of Larry B, Thrall). With him on the brief were Joshua P. Wilson and Alexea Ringo Juliano.

F. Jefferson Hughes, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-cross appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney Genaral, Jeanne E. Davidson, Director, William F. Ryan, Assistant Director, David A. Levitt, and Sameer P. Yerawadekar, Trial Attorneys.

Appealed from: United States Court of Federal Claims

Senior Judge John P. Wiese

# United States Court of Appeals for the Federal Circuit

2006-5088, -5089, -5090

BANK OF AMERICA, FSB,

Plaintiff-Appellant,

v.

ROY DOUMANI and BEVERLY W. THRALL
(successor to the claims of Larry B. Thrall),

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Cross Appellant.

_____

DECIDED: July 26, 2007

_____


Before MAYER and RADER, <u>Circuit Judges</u>, and GARBIS[*], <u>District Judge</u>.

Opinion for the court filed by <u>Circuit Judge</u> RADER, in which <u>District Judge</u> GARBIS joins.  Dissenting opinion filed by <u>Circuit Judge</u> MAYER.

RADER, <u>Circuit Judge</u>.

In this case arising from the <u>Winstar</u> ruling, <u>United States v. Winstar Corp.</u>, 518 U.S. 839 (1996), the United States Court of Federal Claims made a variety of holdings. In particular, the trial court held that the Bank of America (BoA) filed its complaint within the statute of limitations, that Messrs. Doumani and Thrall were not parties to a contract with the Government, that the plaintiffs deserved no damages for replacing regulatory capital with retained earnings, that BoA deserved an actual cost measure to replace lost

_____

[*]    Honorable Marvin J. Garbis, Senior District Judge, United States District Court for the District of Maryland, sitting by designation.

capital, that a liquidating dividend of $3,496,553 was a cost of substituting tangible capital for the capital lost as a result of the breach of the Government's contract with BoA's predecessor in interest Honolulu Federal Savings and Loan ("HonFed"), that HonFed's average cost of funds supplied a measure of the damages for the capital phased-out as a result of the breach, that BoA receives no damages on its claim for $2 million for a deposit forfeited in association with a failed acquisition, and that BoA receives no tax gross up of the damages awarded. Finding no reversible error in that variety of rulings, this court affirms.

I

The Court of Federal Claims decided the various issues in the present appeal in a series of four decisions: Bank of America, F.S.B. v. United States, 51 Fed. Cl. 500 (2002) (Bank of America I), Bank of America, F.S.B. v. United States, 55 Fed. Cl. 670 (2003) (Bank of America II), Bank of America, F.S.B. v. United States, 67 Fed. Cl. 577 (2005) (Bank of America III), and Bank of America, F.S.B. v. United States, 70 Fed. Cl. 246 (2006) (Bank of America IV). This court will only briefly summarize the facts of these cases. The Court of Federal Claims set forth the facts in detail in its opinions.

In mid-1986, a group of investors led by former United States Secretary of the Treasury William E. Simon (the Simon Group) met government regulators to discuss the possibility of acquiring HonFed, a then-failing savings and loan institution in Honolulu, Hawaii. The Federal Home Loan Bank Board (FHLBB) approved this acquisition on August 29, 1986. To facilitate the acquisition, the Simon Group created a holding company, H.F. Holdings, Inc. (HFH) to purchase HonFed's common Stock. HFH acquired 100 percent of HonFed's stock in exchange for a one-time capital infusion of

$17.7 million, with the understanding that an additional $5 million would be contributed to HonFed by HFH if necessary. As part of this transaction, the parties permitted HonFed to count the $85 million in supervisory goodwill created by the acquisition and the $40 million in subordinated debt issued in connection with it toward its regulatory capital requirement.

In mid-1989, HonFed entered into negotiations with another banking institution, First Nationwide, to acquire all of First Nationwide's Hawaiian branches. HonFed applied for regulatory approval of this acquisition on June 7, 1989. While the application for acquisition was pending, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) on August 9, 1989. Pub. L. No. 101-73, 103 Stat. 183 (Aug. 9, 1989). This act made significant changes in governmental regulation of the savings and loan business, including prohibiting thrifts from using "regulatory goodwill" as a capital asset for regulatory purposes and requiring them to phase out that practice over a five-year period.

On August 28, 1989, the Office of Thrift Supervision (OTS) sent HonFed five proposed conditions for the agency's approval of the First Nationwide acquisition. Under these conditions, OTS did not require HonFed to meet FIRREA's capital requirements to complete the acquisition. HonFed, however, would be subject to liability growth and investment limitations until it met FIRREA's tangible capital requirement.

On August 31, 1989, OTS postponed its decision on the First Nationwide acquisition for 30 days to determine issues of law and policy regarding this transaction which allowed an institution that did not comply with FIRREA's requirements to

purchase another institution. Ultimately, OTS conditioned its approval for the First Nationwide purchase on the infusion, by HFH, of "additional capital into HonFed Bank . . . in the amount necessary for HonFed to immediately meet the 1.5% tangible and 3% core capital requirements as promulgated under FIRREA."

Recognizing the need to raise capital both to complete the branch acquisition and to return HonFed to capital compliance, HFH filed a registration statement with the Securities and Exchange Commission in October 1989 that contemplated the issuance of approximately $100 million of preferred stock through the investment banking firm of Smith Barney, Harris Upham & Co. (Smith Barney). Additionally, HonFed negotiated a deal with First Nationwide allowing HonFed an extension until March 31, 1990, to complete the branch acquisition. HonFed placed $2 million in escrow as consideration for the extension.

While the proposed Smith Barney stock offering was pending, HFH approached a local charitable foundation, the Kamehameha Schools Bernice Pauahi Bishop Estate (the Bishop Estate), about a possible cash infusion in a further effort to remedy HonFed's capital deficiency. Under the resulting arrangement, dated June 29, 1990, the Bishop Estate agreed to provide HonFed with two sources of funding –- a payment of $22.5 million on June 29, 1990 and an additional payment of $22.5 million on September 28, 1990. In exchange for its investment, the Bishop Estate received (i) 450,000 shares of non-cumulative preferred stock in HonFed, with a promised initial dividend of 8% (increasing to specified higher rates after two years), (ii) 500,000 shares of cumulative preferred stock in HFH with dividends ranging from 8 to 13%, and (iii)

30,534 shares of common stock in HFH (representing a 23% ownership stake in the holding company) for the nominal fee of $300 (i.e., $.01 per share).

HonFed did not ever complete the Smith Barney stock issuance. However, HonFed was able to reestablish tangible capital compliance by September 1990 through the Bishop Estate capitalization and through its retention of earnings generated by favorable real estate sales. HonFed, on the other hand, did not meet the deadline for the First Nationwide branch acquisition. Accordingly it forfeited the $2 million it had placed in escrow as consideration for the extension.

On November 6, 1989 the OTS issued regulations, effective December 7, 1989, governing the implementation of FIRREA. The regulations provided that unidentifiable intangible assets, such as goodwill, would have to be excluded when determining compliance with the statute's core capital requirements. On November 14, 1989, in a matter unrelated to the First Nationwide acquisition, the OTS sent a letter to HonFed prohibiting it from investing in certain mortgage products due to the capital requirements of FIRREA.

II

In reviewing judgments of the Court of Federal Claims, this court reviews conclusions of law, such as contract or statutory interpretation, without deference. Mass. Bay Transp. Auth. v. United States, 254 F.3d 1367, 1372 (Fed. Cir. 2001); Kane v. United States, 43 F.3d 1446, 1448 (Fed. Cir. 1994). This court reviews factual findings by the Court of Federal Claims under the "clearly erroneous" standard. City of El Centro v. United States, 922 F.2d 816, 819 (Fed. Cir. 1990); Hankins Const. Co. v. United States, 838 F.2d 1194, 1195 (Fed. Cir. 1988). "A finding is 'clearly erroneous'

when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).

"Different standards of review are applicable to different aspects of a damages award. This court has held that 'the amount of a prevailing party's damages is a finding of fact . . . . Thus, where the amount is fixed by the court, review is in accordance with the clearly erroneous standard of Fed.R.Civ.P. 52(a)." SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1164 (Fed. Cir. 1991). 'However, certain subsidiary decisions underlying a damage theory are discretionary with the court .... Such decisions are, of course, reviewed under the abuse of discretion standard.'" Home Sav. of Am. FSB v. United States, 399 F.3d 1341, 1347 (Fed. Cir. 2005). "The clear error standard governs a trial court's findings about the general type of damages to be awarded (e.g., lost profits), their appropriateness (e.g., foreseeability), and rates used to calculate them (e.g., discount rate, reasonable royalty). The abuse of discretion standard applies to decisions about methodology for calculating rates and amounts." Id. "We review the court's methodology for assessing the cost of replacement capital, including its use of a "safe rate" of return to account for the inherent benefits of the replacement capital, for abuse of discretion." Id.

## A. Statute of Limitations

Under § 2501, all claims brought in the Court of Federal Claims are barred unless filed within six years after accrual. 28 U.S.C. § 2501 (2006). Thus, the present suit is time barred if it accrued before September 29, 1989, six years before the filing date. BoA suggests FIRREA's effective date, the time when the Government put the

new capital requirements into place, as the date the breach accrued. According to BoA, the date of breach would thus be no earlier than December 7, 1989. The government counters accrual can and did occur before the effective date of FIRREA. Specifically, the government identified two letters sent to HonFed before the effective date of FIRREA demanding forbearance from certain mortgage products. According to the government, these letters put HonFed on notice that supervisory goodwill would be unavailable to meet regulatory capital and set the accrual date.

Citing Ariadne and Shane, the trial court noted activity before FIRREA's effective date can indeed start the clock. Bank of America I 55 Fed. Cl. at 505 (citing Ariadne Fin. Serv. Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998); Shane v. United States, 161 F.3d 723, 726 (Fed. Cir. 1998)). The trial court also noted, however, that the government's theory of the case required proof that the thrift itself was sufficiently convinced that supervisory goodwill was no longer available to it as an asset. Id. On review of the government's evidence, the trial court found the letters invoked by the government did not contain a requirement for HonFed to take specific action contrary to its existing contract. These letters, therefore, did not constitute a breach and trigger accrual. Indeed, the trial court found that the earliest letter sufficient to cause a breach carried the date of 6 October 1989. On that date, OTS unambiguously demanded changes consistent with FIRREA. Thus, the trial court held BoA's suit accrued at the earliest in October 1989 and therefore BoA's filing was timely. This court discerns no clear error in the trial court's findings and no error in its conclusions on these points.

## B. Messrs. Doumani and Thrall

Messrs. Doumani and Thrall were members of the Simon group. They rely on La Van v. United States, 382 F.3d 1340, 1346 (Fed. Cir. 2004) for the proposition that individual plaintiffs who establish mutual intent to contract and exchange of consideration with the government are contract parties entitled to pursue damages for breach. In La Van, this court affirmed the trial court's finding of an implied contract based on the "facts and circumstances" surrounding the purchase of a thrift institution. Id. at 1347. Messrs. Doumani and Thrall note they and their co-investors negotiated with the Federal Home Loan Bank Board for HonFed's acquisition even before the creation of HFH. Messrs. Doumani and Thrall further argue the government relied on Mr. Simon's reputation and their commitment "that they would supply up to $2.5 million out of their own pockets if necessary," to satisfy the capital requirements.

The trial court found that the investors created HFH as their wholly owned corporation for the express purpose of purchasing HonFed. The trial court further found the investors owed their duty to provide financing to HFH, not HonFed. Based on the record, the trial court found only HFH, not the individual investors, had a contract with the government. The record adequately supports the trial court's findings. This court discerns no clear error.

## C. Replacement of Regulatory Capital with Retained Earnings

BoA argues that the government forced the retention of earnings to maintain its pre-breach capital position. Citing this court's LaSalle opinion, BoA argues all capital has cost and that it was therefore entitled to damages associated with the retained earnings. LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1375 (Fed.

Cir. 2003). The trial court, however, found that HonFed's stock price increases mirrored those retained earnings. Indeed, BoA admits that the retained earnings resulted in a dollar-for dollar increase in the sales price of HonFed. The trial court concluded HonFed did not suffer any damages from the forced retained earnings. This court again discerns no error in the trial court's reasoning or clear error in its findings.

## D. Cost of Retained Earnings

BoA sought calculation of damages due to the cost of retained earnings at a rate equivalent to a market rate of return. BoA thus sought a rate of 20%, the expected return assuming the funds had been invested rather than retained. The government countered that HonFed should receive, at most, the rate it paid on its dividends – 13%. Agreeing with the government, the trial court based HonFed's cost of retained earnings on the dividends actually paid out to shareholders. The trial court found it unlikely in the rather short period (two-and-a-half years) between the breach of contract and the sale of HonFed to BoA that HonFed incurred costs above those that it paid out in dividends. Further, the trial court noted that, in Home Savings, this court affirmed the determination of the costs of retained earnings based on the lowest-cost source of capital from the thrift's earlier capital raisings as a proxy for what the existing shareholders would demand as a return on retained earnings. Home Sav. of Am., F.S.B., v. United States, 399 F.3d 1341, 1353 (Fed. Cir. 2005). The trial court did not abuse its discretion in using the dividend rate to determine the cost of retained earnings.

## E. Liquidating Dividend of $3,496,553

This issue seeks recovery for real estate transferred to HFH Partners and later sold. Specifically, this issue concerns recovery for the share of the real estate sale that

was paid to the Bishop Estate. Absent the breach, BoA argues that it could have received this amount. The government characterizes the transfer of real estate to HFH as an unrecoverable management fee. The trial court held the transfer of the real estate to HFH was the payment of a dividend in kind made as a direct result of the breach.

But for the breach, HonFed would not have had to transfer 26% percent of its stock to the Bishop Estate. Therefore, absent the breach, BoA would have received the entire value of this property. Additionally, as noted by the trial court, even if the properties had been sold earlier rather than transferred, the proceeds would have been available to be distributed as a dividend or would have enhanced HonFed's purchase price. This court agrees with the trial court's finding that the Bishop Estate's portion of the proceeds of HonFed's real estate sales would have gone to BoA absent the government's breach.

## F. Benefit of Tangible Capital

The government argues that HonFed could have used the Bishop Estate cash infusion to retire HonFed's highest rate debt. On the basis of that observation, the government seeks to require HonFed to mitigate its damages for the benefit of the cash infusion by using the interest rate on HonFed's highest debt at that time. Based on HonFed's actual actions, however, the trial court measured HonFed's mitigation obligations by HonFed's average cost of funds. Although imperfect, the trial court noted that the use of HonFed's "average cost of funds accomplishes what the law requires." Bank of America III 67 Fed. Cl. at 595. Indeed, this court held in Home Savings that "fair and reasonable efforts to mitigate are all that the law requires." 399 F.3d at 1353-

Thus, this court finds trial court's decision consistent with <u>Home Savings</u> and does not evince an abuse of discretion.

## G. Forfeited Deposit

BoA argues the $2 million dollar deposit for the First Nationwide branch acquisition was part of its mitigation efforts. Upon reviewing the record, the trial court found "[t]he evidence demonstrates, however, that the branch acquisition was a business opportunity pursued prior to and independent from FIRREA." <u>Bank of America III</u> 67 Fed. Cl. at 595. The trial court further held that "the March 31, 1990 deadline cannot be attributed to FIRREA since that commitment represented an additional obligation entered into nearly two months after the enactment of FIRREA and ten days after the breach." <u>Id.</u>

The original negotiations for the First Nationwide Hawaiian branches occurred before the enactment of FIRREA. The record shows that FIRREA had an effect on the First Nationwide deal. On the other hand, the record does not show conclusively that the payment of the deposit was part of HonFed's mitigation. The record supports the trial court's finding that the deposit was an attempt to keep an independent deal alive. Thus this court finds no clear error in the trial court's decision.

## H. Tax Gross Up

This court in <u>Home Savings</u> affirmed a tax "gross up" procedure. 399 F.3d at 1356 (upholding as not clearly erroneous Court of Federal Claims' finding that the award compensated the plaintiff for lost monies that would not have been taxable and would therefore be taxed as gross income). This court in <u>Home Savings</u> also affirmed the trial court's tax rate as supported by the trial record, specifically expert testimony. <u>Id.</u> BoA

argues that this case warrants an application of the <u>Home Savings</u> remedy because its award is also taxable. The trial court acknowledged <u>Home Savings</u> but also noted that gross up awards are rarely warranted when the tax rate is uncertain. <u>See, e.g.</u> <u>Citizens Fed. Bank, FSB v. United States</u>, 59 Fed. Cl. 507, 516 (2004). In the present case, the trial court examined the record and found the record very ambiguous on the taxability of the recovery. The trial court further found BoA's tax rate highly variable. The trial court held that if the award indeed turns out to be taxable, BoA could apply for relief under FRCP 60(b). The record supports the trial court's findings. Thus, the trial court's decision is not clearly erroneous.

III

Based on an examination of the trial court's thorough opinion on the variety of different issues in this case, this court affirms.

<u>AFFIRMED</u>

# United States Court of Appeals for the Federal Circuit

2006-5088, -5089, -5090

BANK OF AMERICA, FSB,

Plaintiff-Appellant,

v.

ROY DOUMANI and BEVERLY W. THRALL
(successor to the claims of Larry B. Thrall),

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Cross Appellant.

MAYER, <u>Circuit Judge</u>, dissenting.

Despite more than a decade and a half of <u>Winstar</u> litigation, this is the first time we must decide with such precision when a thrift's breach of contract claim accrues under the 28 U.S.C. § 2501[*] statute of limitations. In my view, the August 9, 1989, enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 ("FIRREA"), caused Bank of America, FSB ("BoA")'s claim to accrue. And it certainly accrued no later than September 22, 1989, based on individualized regulatory action taken by the Office of Thrift Supervision ("OTS") against

---

[*] 28 U.S.C. § 2501 provides in pertinent part:

Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

BoA during August and September 1989. Accordingly, BoA failed to timely file in the Court of Federal Claims. Because its petition must, therefore, be dismissed for lack of jurisdiction, see, e.g., John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir. 2006), cert. granted, 75 U.S.L.W. 3636 (U.S. May 29, 2007) (No. 06-1164) (the six-year limitations period under 28 U.S.C. § 2501 is jurisdictional); Frazer v. United States, 288 F.3d 1347, 1351 (Fed. Cir. 2002) (same), I dissent.

In determining when BoA's claim accrued, we are guided by United States v. Winstar Corp., 518 U.S. 839 (1996), in which the Supreme Court said: "When the law as to capital requirements changed in the present instance, the Government was unable to perform its promise and, therefore, became liable for breach." Id. at 870 (emphasis added). The Court further stated that "the Government breached these contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA, 12 U.S.C. § 1464(t), the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating respondents' net worth." Id. This language compels the conclusion that the government breached its contracts with the thrifts when it enacted FIRREA, but we have yet to so hold. See Shane v. United States, 161 F.3d 723, 727 (Fed. Cir. 1998).

Indeed, until now, in cases where the Court of Federal Claims' jurisdiction was at issue, the claimants had always filed suit more than six years after any of the three generalized governmental actions that might have triggered the statute of limitations: enactment of FIRREA (Aug. 9, 1989); promulgation of implementing regulations (Dec. 7, 1989); and publication of an OTS bulletin reminding thrifts with forbearance agreements that it was applying the regulations against them (Jan. 9, 1990). See, e.g., Shane, 161

F.3d 723; Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874 (Fed. Cir. 1998). Therefore, in reviewing the trial court's dismissals, it was unnecessary to specify which event first triggered the running of the limitations period, and we declined to do so. Shane, 161 F.3d at 726-27; Ariadne, 133 F.3d at 880. Here, however, the issue is squarely before us, because BoA filed suit on September 29, 1995—more than six years after the enactment of FIRREA, but fewer than six years after promulgation of the implementing regulations.

In determining whether FIRREA's enactment, without more, caused BoA's claim to accrue, we look to what the government promised and whether FIRREA itself effected a breach of that promise to any extent. See Franconia Assocs. v. United States, 536 U.S. 129, 141-43 (2002) ("When performance of a duty under a contract is due[,] any non-performance is a breach.") (quoting Restatement (Second) of Contracts § 235(2) (1979)); Kinsey v. United States, 852 F.2d 556, 558 (Fed. Cir. 1988). In other words, once BoA was denied use of its supervisory goodwill or any other element of its agreement, its claim for breach accrued, and subsequent denials did not give rise to new or additional claims. Ariadne, 133 F.3d at 879; see also Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. __, slip op. at 8-9 (2007); Winstar, 518 U.S. at 870. Moreover, individualized regulatory action against BoA was not necessary to trigger the statute of limitations, Shane, 161 F.3d at 726; a generalized governmental action, like FIRREA, is sufficient. Id.

Under BoA's 1986 contract, the government agreed, inter alia, that BoA had the right to count supervisory goodwill, amortized over a 25-year period, toward its regulatory capital requirements, and that for a 10-year period it could operate under less

stringent regulatory capital requirements than those generally applicable to thrifts. <u>Bank of Am., FSB v. United States</u>, 51 Fed. Cl. 500, 503 (2002) ("<u>Bank of America I</u>"). FIRREA constitutes a breach, and not merely an anticipatory repudiation, <u>see</u> <u>Franconia</u>, 536 U.S. at 142-43,  because it brought the government into immediate non-compliance with the full scope of its obligations under its agreement with BoA.

The act mandated that the government could not provide BoA with special regulatory treatment for the entirety of the 10 and 25-year terms.  The government's promise did not merely provide special treatment at a given moment (e.g., August 9, 1989), but it also encompassed a guarantee to so provide from that moment on, for the remaining balance of the agreed upon term (e.g., for 7 and 22 years beyond 1989). Even if the act did not immediately raise the specter of sanctions or enforcements actions, it meant that as of August 9, 1989, the government necessarily, by statutory obligation, viewed the promised supervisory goodwill, etc., as no longer fully available, at least for business or acquisition purposes taking place after December 7, 1989 (the latest date on which OTS' implementing regulations could be made effective).  This effected a breach of the contract as of August 9, 1989, because such a limited view of the available uses of BoA's supervisory goodwill, etc., was contrary to the government's agreement that the special capital would count "as capital for all purposes."  Trial Tr. at A500109.   The error in <u>Plaintiffs in Winstar-Related Cases v. United States</u>, 37 Fed. Cl. 174 (Ct. Cl. 1997), was the failure to appreciate the forward-looking aspects of the government's promise and FIRREA's immediate impact on them.

This understanding of the contract is consistent with <u>Franconia</u>, 536 U.S. 129. There, the government's contractual obligation was to accept pre-payment when

tendered on government-provided mortgages.  Id. at 142-43.  This meant that the government's performance was not due until payment was tendered, and the statute there at issue could serve only as an anticipatory repudiation.  Id. at 143.  Here, by contrast, the government's obligation was continuous for the life of the agreement and not contingent upon any act by BoA.  However minor FIRREA's immediate breach may appear, promulgation of the implementing regulations, the OTS bulletin, and pre-December 7, 1989, individualized regulatory action against BoA did nothing more than exacerbate that breach.  See Winstar, 518 U.S. at 870.  Therefore, they could not have caused BoA's claim to first accrue.  See Ariadne, 133 F.3d at 879.  Moreover, this understanding of when the breach occurred comports with the general principle that waivers of sovereign immunity and statutes of limitations are construed narrowly.  See, e.g., BP Am. Prod. Co. v. Burton, 127 S. Ct. 638, 646 (2006); United States v. Dalm, 494 U.S. 596, 608 (1990); Fannie Mae v. United States, 469 F.3d 968, 973 (Fed. Cir. 2006); John R. Sand & Gravel, 457 F.3d at 1355.  Therefore, because BoA's claim accrued on August 9, 1989, its September 29, 1995, filing was untimely.

Even under the majority's theory of accrual, BoA still failed to timely file.  The majority does not address whether FIRREA itself effected a breach.  Ante at 6-7.  Instead, it agrees with the trial court's conclusion that the October 6, 1989, letter, requiring BoA to comply with certain FIRREA capital requirements before it would approve the acquisition of First Nationwide branches, was sufficiently contrary to the government's contract with BoA to constitute a breach.  Ante at 7.  Accordingly, it recognizes that individualized regulatory activity before December 7, 1989 (the effective date of FIRREA's implementing regulations) can trigger the statute of limitations.  But it

does not properly apply this standard; certain pre-September 29, 1989, regulatory activity violated the government's agreement with BoA.

On August 31, 1989, OTS issued a bulletin that required BoA to describe in future securities filings how it intended to raise capital to satisfy FIRREA's requirements. Bank of America I, 51 Fed. Cl. at 505. Also on August 31, OTS notified BoA that it was postponing its decision on the First Nationwide acquisition based on the "significant issue of law or policy regarding whether [OTS] should permit an institution not meeting the tangible capital requirement of [FIRREA] to increase its insured deposits through a branch purchase." Id. at 507. But for this postponement, the acquisition would have been automatically approved on September 5, 1989, and the government provided no reason for the delay other than FIRREA. Id. Moreover, a September 22, 1989, OTS memorandum evinces the government's intent not to approve the First Nationwide acquisition without a capital infusion, A400517-18; an infusion that would have been unnecessary but for FIRREA, and was contrary to the government's promises under its contract with BoA. Taken together, these actions show that before September 29, 1989, the government was actively regulating BoA in a manner inconsistent with its promises under the contract, and was, therefore, liable for breach. Accordingly, BoA's claim could not have first accrued on October 6, 1989, because the letter from that date merely provided further confirmation of that which should have already been abundantly clear.