BANK OF AMERICA, FSB,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 95–660C, 95–797C, 95–7971C.

United States Court of Federal Claims.

July 21, 2005.

■■■■■■■■■■■■■■

Steven S. Rosenthal, Kaye Scholer LLP, Washington, D.C., attorney of record for plaintiff Bank of America, FSB. Alan K. Palmer, Douglas A. Tucker, and Maria Whitehorn Votsch, Kaye Scholer LLP, of counsel.

Edward P. Sullivan,* with whom were Deputy Assistant Attorney General Stuart E. Schiffer, Director David M. Cohen, and Deputy Director Jeanne E. Davidson, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., F. Jefferson Hughes and David A. Levitt, Commercial Litigation Branch, Civil Division, Department of Justice, for defendant, of counsel.

## OPINION

WIESE, Judge.

This decision follows a trial on damages held from July 12–29 and resuming from August 23–September 2, 2004. At trial, plaintiff Bank of America sought $68.972 million in expectancy damages resulting from the government's breach of a contract allowing, *inter alia*, plaintiff's predecessor institution to count supervisory goodwill and subordinated debt toward its regulatory capital requirements. After reviewing the parties' post-trial submissions, the court heard closing arguments on May 10, 2005. For the reasons set forth below, we now find that plaintiff is entitled to damages, but postpone the entry of judgment granting plaintiff a

---

* Tonia J. Tornatore was the attorney of record for defendant throughout the trial proceedings but was succeeded on March 11, 2005, by Lee M. Straus, who served as lead counsel for the closing arguments on May 10, 2005. Edward P. Sullivan in turn assumed the position of counsel of record on May 18, 2005.

1. In *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the Supreme Court held that the United States had breached its contract with various financial institutions by failing to honor special accounting methods provided for by contract.

2. The Simon Group consisted of former United States Secretary of the Treasury William E. Si-

sum certain pending the submission of further calculations by the parties.

## BACKGROUND

This action belongs to the final wave of cases known collectively as the *Winstar* litigation[1]—the more than 120 suits filed in the early to mid-1990s in response to the government's passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified as amended in scattered sections of 12 U.S.C.). In the earlier stages of this litigation, the court held that (i) Bank of America ("B of A") is the proper party in interest in this action; (ii) the government breached its contract permitting B of A's predecessor, Honolulu Federal Savings & Loan Association ("HonFed" or "the thrift"), to record supervisory goodwill and subordinated debt as capital; and (iii) B of A's cause of action accrued on October 6, 1989, when the government conditioned HonFed's proposed branch acquisition on compliance with FIRREA capital standards in violation of the contract. *Bank of America, FSB v. United States*, 51 Fed.Cl. 500 (2002); *Bank of America, FSB v. United States*, 55 Fed.Cl. 670 (2003). The court must now determine what damages, if any, are properly identifiable with the government's breach.

## FACTS

In mid-1986, the Simon Group, a partnership of well-known and highly regarded businessmen,[2] approached the government about acquiring HonFed, a then-insolvent thrift based in Honolulu, Hawaii. Pursuant to the resulting agreement with the government,

mon, Gerald L. Parsky, Roy Doumani, Preston Martin, and Larry B. Thrall. Although several of the investors originally sued in their individual capacities, William E. Simon and Gerald L. Parsky subsequently withdrew their actions, and the court ultimately held that B of A, rather than the individual investors, was the proper party in interest as successor to the claims of HFH and HonFed. *Bank of America*, 55 Fed.Cl. at 677–78. In an order dated November 5, 2003, the court dismissed the remaining claims of Larry B. Thrall and Roy Doumani but withheld entering judgment pending the conclusion of proceedings in this case.

the Simon Group formed a holding company, H.F. Holdings, Inc. ("HFH" or "the holding company"), which acquired 100 percent of HonFed's stock in exchange for a one-time capital infusion of $17.7 million, with the understanding that an additional $5 million would be contributed to HonFed by HFH as necessary. As part of this transaction, HonFed was permitted to count the $85 million in supervisory goodwill [3] created by the acquisition and the $40 million in subordinated debt issued in connection with it toward its regulatory capital requirement. The thrift was additionally permitted to amortize its supervisory goodwill under a straight-line method of accounting over a 25–year period and was granted a capital forbearance exempting it from the standard net worth requirements so long as HonFed met certain specified net worth-to-total liabilities ratios identified in the contract.

Following its acquisition of HonFed, HFH submitted an application to federal regulators in June 1989 seeking approval to acquire a number of branches belonging to its competitor First Nationwide Bank ("First Nationwide"). On August 9, 1989, while that application was pending, the government enacted FIRREA. As a result of the enactment and the December 7, 1989, implementing regulations, HonFed was no longer permitted to count supervisory goodwill as regulatory capital [4] and found itself immediately out of compliance with the new requirement that an institution's tangible capital constitute 1.5 percent of its tangible assets.[5]

Pursuant to the new FIRREA-imposed standards, the Office of Thrift Supervision ("OTS") approved HFH's proposed acquisition of the First Nationwide branches on October 6, 1989, but conditioned that approval on HonFed's satisfaction of certain capital requirements, specifically the infusion of $88 million in tangible capital. Recognizing the need to raise capital both to complete the branch acquisition and to return HonFed to capital compliance, HFH filed a registration statement with the Securities and Exchange Commission in October 1989 which contemplated the issuance of approximately $100 million of preferred stock through the investment banking firm of Smith Barney, Harris Upham & Co. ("Smith Barney"). HonFed's CEO Gerald M. Czarnecki additionally negotiated a deal with First Nationwide allowing HonFed an extension until March 31, 1990, to complete the branch acquisition.

While the proposed Smith Barney stock offering was pending, HFH approached a local charitable foundation, the Kamehameha Schools Bernice Pauahi Bishop Estate ("the Bishop Estate"), about a possible cash infusion in a further effort to remedy HonFed's capital deficiency. Under the resulting arrangement, dated June 29, 1990, the Bishop Estate agreed to provide HonFed with two tranches of funding—a payment of $22.5 million on June 29, 1990, and an additional payment of $22.5 million on September 28, 1990. In exchange for its investment, the Bishop Estate received (i) 450,000 shares of non-cumulative preferred stock [6] in HonFed,

**3.** Supervisory goodwill is an accounting concept, recognized under Regulatory Accounting Principles (RAP), that reflects the excess of an insolvent institution's liabilities over its assets at the time of acquisition. Through an accounting fiction, the amount of supervisory goodwill is treated as an asset in satisfaction of certain regulatory requirements. Prior to the passage of FIRREA, for example, HonFed was allowed to count $85 million in supervisory goodwill toward the regulatory requirement that it maintain a tangible net worth equaling 2 percent of its liabilities.

**4.** In addition, HonFed's modified capital requirement was eliminated on January 9, 1990, by the issuance of the Office of Thrift Supervision's Bulletin 38–2.

**5.** In its May 31, 1989, "Report of Examination," HonFed recorded regulatory capital in the amount of $119 million, or 3.9 percent of its total assets, which was in excess of the 3 percent regulatory capital requirement under the 1986 capital forbearance agreement. As of December 31, 1989, however, HonFed reported negative tangible capital of $20 million—$66.3 million less than the $46.3 million that was necessary under the new requirements.

**6.** The term "preferred" denotes shares that receive priority over other classes of stock in the payment of dividends. HFH was not permitted to pay out dividends to common shareholders, for example, until it had first satisfied its obligations to its preferred shareholders. The term "cumulative" refers to preferred shares for which dividends that are not distributed in a particular quarter accrue for later payout to the shareholders. In the case of non-cumulative pre-

with a promised initial dividend of 8 percent (increasing to specified higher rates after two years), (ii) 500,000 shares of cumulative preferred stock in HFH with dividends ranging from 8 to 13 percent, and (iii) 30,534 shares of common stock in HFH (representing a 23 percent ownership stake in the holding company).

Although the Smith Barney stock issuance was never completed, HonFed was able to reestablish tangible capital compliance by September 1990 through the Bishop Estate capitalization and through its retention of earnings generated by favorable real estate sales. HonFed was unable to meet the deadline for the First Nationwide branch acquisition, however, and was forced to forfeit the $2 million it had placed in escrow as consideration for the extension.

In July 1992, B of A acquired HonFed and HFH in a series of transactions that ultimately resulted in the dissolution of both the thrift and the holding company. B of A subsequently filed suit in this court on September 29, 1995, claiming damages for defendant's breach of contract.[7]

## DISCUSSION

### I.

Plaintiff describes its theory of recovery in this case as involving the "cost of cover," *i.e.,* expectancy damages measured by the costs associated with replacing the thrift's lost goodwill with tangible capital. *See Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060, 1066 (Fed.Cir.2001) (holding that the breach of an executory contract entitles the non-breaching party to obtain substitute performance under the contract and to recover the cost of that substi-

tute performance); *LaSalle Talman Bank, FSB v. United States,* 317 F.3d 1363, 1374 (Fed.Cir.2003) (observing that "the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the Winstar context").[8] Specifically, plaintiff argues that HonFed was required to replace its supervisory goodwill with tangible capital at a time when raising such capital came at a high price due to the risks associated with both HonFed individually and the thrift industry more generally. Plaintiff contends that HonFed was thus forced to pay in the neighborhood of 20 percent to raise the required replacement capital when its previous cost of borrowing (in the form of, *inter alia,* low-cost, federally insured deposits) ranged from 5.7 to 8 percent. In simplest terms, plaintiff now seeks the difference between these two amounts.

Numerous courts have indeed allowed recovery based on the cost to an injured thrift of mitigating its damages, specifically, the cost incurred by the thrift in replacing its lost goodwill. *See, e.g., LaSalle,* 317 F.3d at 1374 (recognizing that "the cost of replacement capital can serve as a valid theory for measuring expectancy damages ... because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill"); *Citizens Fed. Bank, FSB v. United States,* 59 Fed.Cl. 507, 516 (2004) (describing the cost of capital replacement as "a good measure of a *Winstar* plaintiff's expectancy interest"). Such costs, however, are generally offset by any benefit to the thrift found to flow directly from the breach. *See LaSalle,* 317 F.3d at 1375 (recognizing that "in determining damages

ferred stock, by contrast, the obligation to pay dividends is eliminated if those dividends are not declared in the quarter in which they are earned.

7. Plaintiff additionally alleged a Fifth Amendment taking of its property, but the court dismissed those counts of the complaint in an order dated November 5, 2003. As with the claims of Mr. Thrall and Mr. Doumani, however, entry of judgment with respect to those claims was withheld until the conclusion of all proceedings in this action.

8. In the alternative, plaintiff relies on *Northern Helex Co. v. United States,* 225 Ct.Cl. 194, 634

F.2d 557 (1980), for the proposition that an injured party is entitled to recover the costs associated with taking reasonable steps to avoid greater loss, *i.e.,* mitigation costs. *See also* Restatement (Second) of Contracts § 350(2) (1981) (an injured party is not precluded from recovering mitigation costs "to the extent that the party has made reasonable but unsuccessful efforts to avoid loss"). Plaintiff maintains, however, that the damage amounts under either the cost of cover theory or the mitigation theory are identical.

the benefits of ... capital must be credited, as mitigation due to the replacement of goodwill with cash"); *Citizens Fed.*, 59 Fed.Cl. at 526 (holding that "the burden is on [the thrift] to consider the beneficial effects of mitigation in its damages calculation"); *see generally* Restatement (Second) of Contracts § 347 (1981). Thus, in determining the amount of damages herein, the court must first identify the costs to HonFed of restoring itself to capital compliance and second offset those costs by any benefits resulting directly from the breach.

While the parties do not agree on all the factors that distinguish tangible capital from supervisory goodwill, they do agree that one is not the perfect substitute for the other, primarily because of two benefits that cash possesses and goodwill does not—the fact that cash can be invested to generate a return and that it is not subject to amortization. A number of the adjustments in both parties' damages models, in fact, attempt to account for these critical differences. Plaintiff thus identifies its damages as those costs associated with replacing supervisory goodwill with the Bishop Estate infusion and the retention of earnings, less the benefits tangible capital enjoyed over the goodwill it replaced. Defendant in turn argues that plaintiff's damages are limited to its transaction costs or, under an alternative theory, that its benefits ultimately exceeded its costs and no damages are therefore owing.

In seeking expectancy damages, plaintiff originally offered two alternative theories of recovery—the first based on an ex post analysis of the costs it actually incurred in replacing supervisory goodwill with tangible capital and the second based on an ex ante analysis of the amount of capital necessary to replace supervisory goodwill calculated as of the date of the breach.[9] During closing arguments, however, plaintiff withdrew its alternative theory in light of the Federal Circuit's recent decision in *Fifth Third Bank of Western Ohio v. United States*, 402 F.3d 1221 (Fed. Cir.2005), a case in which the court rejected a damages calculation virtually identical to plaintiff's ex ante model on the ground that the damages were "based entirely on hypothetical costs that were never actually incurred." *Id.* at 1237. We therefore limit our analysis to plaintiff's ex post damages model, under which it claims damages in the amount of $68.972 million.[10]

II.

Damages under plaintiff's ex post model are made up of three elements: the costs of raising capital through the Bishop Estate transaction (a $17.5 million loss on the HFH common stock transferred to the Bishop Estate, $6.572 million in net expenses associated with the payment of dividends on the Hon Fed and HFH preferred shares, and $4.977 million in transaction costs); the costs of retaining earnings to make up for the additional supervisory goodwill not replaced by the Bishop Estate infusion; and an amount plaintiff refers to as "wounded bank" damages reflecting the costs incurred in connection with HonFed's further attempt to mitigate its damages. Because HonFed would not, in plaintiff's view, have needed to raise additional capital but for the government's breach, plaintiff argues that all of the costs associated with both the Bishop Estate trans-

---

9. Patterning his ex ante model after the approach used in *Glass v. United States*, 47 Fed.Cl. 316, 328 (2000), *vacated in part by* 258 F.3d 1349 (Fed.Cir.2001), plaintiff's expert, Dr. Nevins D. Baxter, posited a hypothetical stock offering by HonFed designed to replace its disallowed goodwill with tangible capital. *Assuming a 16 percent rate of return and a repayment of principle that mirrored the amortization schedule of goodwill (i.e.,* to reflect the fact that HonFed's supervisory goodwill would have been amortized at the rate of $3.936 million per year over a 20-year period), Dr. Baxter calculated that such a stock issuance would have raised $53.295 million in December 1989—$32.307 million short of Hon-Fed's $85.602 million in disallowed goodwill.

Dr. Baxter thus identified plaintiff's damages as consisting of that $32.307 million shortfall, plus an additional $10.964 million for the sub-debt that could no longer be counted toward regulatory capital.

10. Plaintiff also seeks an amount that it identifies as a "tax gross-up," *i.e.*, a sum designed to compensate plaintiff for the tax it may be required to pay on any award of damages. Assuming a marginal composite state and federal tax rate of 37.28 percent, plaintiff calculates a tax gross-up of $24.693 million on its ex post damages. We discuss the legitimacy of such a gross-up in section IV below.

action and the retention of earnings are chargeable to defendant.

## A. *Costs Associated With the Bishop Estate Transaction*

Plaintiff's expert, Dr. Nevins D. Baxter, an economist with extensive experience testifying in *Winstar* trials, described the Bishop Estate transaction as consisting of two distinct elements: a preferred stock component and a common stock component. According to Dr. Baxter, the Bishop Estate paid $45 million for 450,000 shares of non-cumulative preferred stock in HonFed at $100 per share (*i.e.,* at par value) and $5 million for 500,000 shares of cumulative preferred stock in HFH at $10 per share,[11] accounting for almost the entirety of the Bishop Estate's investment. In addition, the Bishop Estate received 30,-534 shares of common stock in HFH for the nominal fee of $300 (*i.e.,* $.01 per share).

The Bishop Estate transaction was set up in such a way, Dr. Baxter explained, that if HonFed failed to pay the negotiated 13 percent dividend on its preferred stock, then HFH would make up the difference on a cumulative basis, effectively making the HFH preferred stock cumulative on the entire $50 million investment. Pursuant to this arrangement, HonFed paid an 8 percent dividend on its non-cumulative preferred shares (the minimum dividend) and HFH paid an 8 percent dividend on its cumulative preferred shares. Upon the sale of HonFed to B of A, however, the Bishop Estate received not only the accumulated 5 percent dividend on its $5 million of HFH preferred shares, but also the unpaid 5 percent yield differential on its $45 million of HonFed non-cumulative preferred shares.[12] Thus, while the Bishop Estate was issued an 8 percent dividend for the first two and a half years after the infusion,

it ultimately received the entire 13 percent dividend originally specified.

Dr. Baxter identified several factors for structuring the transaction this way. First, because OTS regulations prohibited a thrift from counting cumulative preferred stock toward its regulatory capital, HonFed was limited to issuing non-cumulative preferred stock—an option that, standing alone, would have been less attractive to prospective investors. Additionally, the structure of the deal allowed a capital-strapped HonFed to pay a much lower dividend rate than the rate it would otherwise have been required to pay to attract capital. Finally, the Bishop Estate itself had a policy of making investments that included both an income stream (*i.e.,* the dividends paid on preferred stock) and the possibility for capital appreciation (*i.e.,* the equity interest in HFH represented by the common stock). It was the combination of stock in HonFed and HFH, in other words, that made the transaction acceptable both to the Bishop Estate and to government regulators.

Based on the structure of the Bishop Estate transaction, Dr. Baxter made a number of assumptions about the values of the preferred and common stock. Despite the stated dividend rate on the preferred stock of 13 percent and the stated price of the common stock of $.01 per share, Dr. Baxter concluded that neither figure represented the true market value of those shares. As to the common stock, Dr. Baxter argued that a 23 percent ownership interest in HFH, sold two years later for $26.2 million, would not have been given away for the nominal amount of $300 in a stand-alone transaction. Nor, Dr. Baxter maintained, did a 13 percent dividend rate on the preferred stock represent the true market rate for capital in light of the fact that HonFed's debt provided a 20 percent implied yield during the same time period[13] and that

11. Despite its $10 per-share issuance price, the HFH preferred stock had a stated face value of $100 per share. Thus, if the stock were later transferred, the acquirer would be required to pay a price of $100 per share.

12. The accumulated dividends were paid in a lump sum of $5.857 million by B of A at the time of the bank's acquisition of HonFed and HFH. We discuss the significance of this payment in section III below.

13. Based on his analysis of the pricing data set forth in the "yellow sheets" (an industry reporting of bond rates), Dr. Baxter testified that HonFed's debt—initially issued at 13.5 percent in 1986—went from a bid price of 90 (or $900 for a $1000 bond) with an implied yield of 15.58 percent on November 10, 1989 (*i.e.,* prior to the passage of FIRREA), to 70.25 (or $702.50 for a $1000 bond) with an implied yield of 20.94 percent on December 11, 1989. Because investors

investors, in Dr. Baxter's own experience, were requiring rates of return on equity for financial institutions in excess of 30 percent.

In order to adjust for these inconsistencies in stock prices, Dr. Baxter thus substituted what he deemed a "conservative" 20 percent rate of capital for the 13 percent actually offered by HonFed and HFH,[14] causing him to conclude that the true market value of HonFed's and HFH's perpetual preferred stock was $32.5 million (a figure derived by dividing the projected dividend payout by the expected return)[15] and that the true value of the HFH common stock was accordingly $17.5 million (the total investment of $50 million less the recalculated market value of the preferred stock). Because HonFed received a mere $300 in payment for its common shares, however, Dr. Baxter identified the stock's conveyance to the Bishop Estate as a $17.5 million damage to the thrift (relying on *McCandless v. Furlaud*, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121 (1935), for the proposition that the issuance of corporate stock for less than its true value results in a compensable legal injury to the corporation, realized as of the date of the stock transfer).

In Dr. Baxter's view, however, the costs associated with the Bishop Estate transaction were not limited to the damages associated with the common stock, but also included dividend payments made by HonFed and HFH on the preferred shares. In order to calculate the net costs associated with these dividends, Dr. Baxter offset the total amount of preferred dividends paid ($13.386 million) by HonFed's average cost of funds (ranging from 5.7 to 8 percent) to account for the fact that the cash—an investable asset used to generate proceeds—had a value

to HonFed above and beyond the non-investable regulatory capital that was lost. Such an adjustment was appropriate, Dr. Baxter noted, because the capital infusion by the Bishop Estate represented a costlier source of funds than did HonFed's usual source of funding (*e.g.*, insured deposits). The offset therefore reflected the difference between the amount HonFed would have paid for its funding absent the breach and the amount it was in fact required to pay in connection with the Bishop Estate transaction. Using this method, Dr. Baxter calculated damages identifiable with the issuance of the preferred stock in the amount of $6.572 million.

As a third and final aspect of the costs associated with the Bishop Estate infusion, Dr. Baxter identified various transaction costs arising from the issuance of the HonFed stock: $500,000 in accounting fees paid to KPMG Peat Marwick LLP and the accounting firm of Kenneth Leventhal; $2.88 million in financial advisory fees paid to Smith Barney, WSGP International, Inc., and WSGP Financial Management Co.; $940,000 in legal fees paid to Gibson, Dunn & Crutcher LLP; and $290,000 in printing costs paid to Pandick Press, Inc. Dr. Baxter additionally included a non-itemized cost of $367,000, arising from the issuance of the HFH stock. Dr. Baxter thus calculated total transaction costs of $4.977 million, for a total of $29.049 million in costs purportedly incurred in connection with the Bishop Estate transaction.

## B. Costs Associated With Retained Earnings

In addition to the damages associated with the Bishop Estate transaction, Dr. Baxter

---

generally demand a greater return on equity than on debt, Dr. Baxter pointed to the yellow sheets as evidence that his 20 percent projected return rate on equity was, if anything, a conservative estimate.

**14.** In reaching the conclusion that the market rate for attracting capital was in the neighborhood of 20 percent, Dr. Baxter relied upon several sources: the aforementioned yellow sheets reflecting ask and bid prices on HonFed's sub-debt; a January 4, 1990, memorandum prepared by an employee of HonFed after consultation with various Wall Street firms suggesting a cost of capital in excess of 20 percent; the testimony of Bishop Estate representative Mitchell Gilbert that the

Bishop Estate expected a return on its cash infusion in the neighborhood of 30 percent; and a December 7, 1989, report by Kidder, Peabody & Co. identifying the "Finance" sector of the economy's cost of capital as 19.58 percent.

**15.** Dr. Baxter explained that the value of a perpetual security (*i.e.*, one with no maturity date) is calculated by dividing the expected annual amount payable on that security by the yield an investor is seeking to achieve. Because $50 million in perpetual preferred stock paying 13 percent would generate $6.5 million annually in dividends, an investor seeking a 20 percent return would pay $32.5 million for that stock (*i.e.*, $6.5 million/.20).

testified that plaintiff should similarly be entitled to recover the costs to HonFed of using retained earnings to replace supervisory goodwill since the $50 million infused by the Bishop Estate was insufficient to return HonFed to capital compliance.[16] In Dr. Baxter's view, HonFed was therefore forced to retain the proceeds from the sale of the real estate in order to restore the thrift to its pre-breach capital position, proceeds that could have been used, in a non-breach world, to pay dividends or to expand the thrift's capital base.

In order to calculate the damages associated with the retention of earnings, Dr. Baxter began with the premise, endorsed by the Federal Circuit in *LaSalle*, 317 F.3d at 1375, that all capital has a cost. Although Dr. Baxter identified the amount of dividends paid as an appropriate method for calculating the costs associated with the transfer of the preferred shares to the Bishop Estate, he testified that such an approach could not be used to measure the cost of retaining earnings because the two-year time frame was too short a period for dividends to approximate the cost of capital. According to Dr. Baxter, the real cost of retaining earnings was instead the rate of return that would have been demanded by the market—a number he identified as 20 percent, consistent with the rate of return he had calculated for the preferred shares.[17] Dr. Baxter accordingly determined that the earnings retained by HonFed between December 1989 and July 1992, less HonFed's average cost of funds (reflecting, as with the preferred stock, the benefits of cash over goodwill), resulted in damages of $12.495 million.

## C. *Wounded Bank Damages*

The final element of plaintiff's damages calculation is its wounded bank damages.[18] Dr. Baxter identified these damages as consisting of (i) costs associated with the failed First Nationwide branch acquisition (the forfeiture of the $2 million escrow deposit and a capitalized write-off of $156,000 for equipment purchased in anticipation of the acquisition); (ii) costs associated with the unsuccessful Smith Barney stock issuance ($237,000); and (iii) costs associated with a new capital plan that was required after the passage of FIRREA ($336,000), for a total of $2.729 million.[19]

### III.

Defendant challenges plaintiff's damages calculations on a number of grounds. We address each of defendant's arguments in turn below.

## A. *Causation*

■ In order to make a successful claim for expectancy damages, a plaintiff must

---

**16.** In its June 30, 1990, financial statements, HonFed reported tangible capital in the amount of $18.935 million, representing a tangible capital ratio of .63 percent, less than half of its 1.5 percent tangible capital requirement. By September 30, 1990 (*i.e.*, after the second Bishop Estate infusion), HonFed's tangible capital had risen to $62.493 million, representing a tangible capital ratio of 2.15 percent, $19 million in excess of its 1.5 percent requirement. During that time, however, HonFed had retained $32.7 million in earnings.

**17.** Dr. Baxter explained that an institution's retention of earnings essentially amounts to the raising of new capital from existing shareholders and that those shareholders in turn expect the same rate of return that new investors would require. The "cost" of retaining earnings, Dr. Baxter further explained, is thus measured by the rate of return demanded by those shareholders in the form of future dividends.

**18.** In various other *Winstar* cases, wounded bank damages have been characterized as an element of reliance damages. *See, e.g., Anchor Sav. Bank,*

*FSB v. United States,* 59 Fed.Cl. 126, 138 (2003) (identifying "wounded bank" as "a term used to describe the actual costs incurred by the bank as a result of the breach"); *Glendale Fed. Bank, FSB v. United States,* 43 Fed.Cl. 390, 397 (1999) (describing wounded bank damages as the "non-overlapping reliance damages" caused by a thrift's failure to maintain capital compliance after a breach). In the instant case, plaintiff characterizes its wounded bank damages not as a facet of reliance—a theory it has abandoned—but as an element of mitigation. *See Globe Sav. Bank, FSB v. United States,* 59 Fed.Cl. 86, 92 n. 9 (2003) (discussing such damages as an "incidental loss" included in expectancy damages under Restatement (Second) of Contracts § 347(b)).

**19.** Plaintiff's original estimate of its wounded bank damages, listed in its initial filings as $2.735 million, failed to take into account a $5,999 refund it had received in connection with its Smith Barney fees. The $2.729 million figure reflects this adjustment.

demonstrate that the damages were actually foreseen or were reasonably foreseeable at the time of contracting, that the damages were caused by the breach, and that the damages can be proven with reasonable certainty. *La Van v. United States*, 382 F.3d 1340, 1351 (Fed.Cir.2004); Restatement (Second) of Contracts §§ 347, 351, 352 (1981). Defendant offers no serious challenge to the assertion that HonFed's need to raise capital in the wake of FIRREA was foreseeable by the parties at the time of contracting.[20] Defendant does contend, however, that neither the Bishop Estate transaction nor the retention of earnings was proximately caused by the breach. To support this argument, defendant claims that the advantages of raising capital would have led HonFed to seek out a capital infusion even in the absence of FIRREA. Defendant additionally points out that HonFed had retained earnings as part of its business strategy prior to the breach and had historically retained 90 percent of its earnings until that time. Given these factors, defendant maintains that plaintiff cannot make a showing that it would have avoided the costs associated with the Bishop Estate transaction and the retained earnings but for the breach. *See California Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed.Cir.2005) (*"CalFed"*) (requiring a showing "by a preponderance of the evidence that profits would have been made but for the breach");[21] *Hughes Communications*, 271 F.3d at 1066 ("A plaintiff must show that but for the breach, the damages alleged would not have been suffered."); Restatement (Second) of Contracts § 347 cmt. e

(1981) ("Recovery can be had only for loss that would not have occurred but for the breach.").

■ With respect to the Bishop Estate transaction, we find that plaintiff has clearly made its case. Although the beneficial effects of additional capital are undisputed (including the ability to expand the bank or to absorb unforeseen losses), the evidence overwhelmingly demonstrates that the need for such capital was occasioned by FIRREA and that HonFed would not otherwise have pursued an infusion of the sort represented by the Bishop Estate transaction. Roy Doumani, a member of the original investor group, testified, for instance, that the raising of capital was "never seriously considered" by the Simon Group except as it was made necessary by FIRREA. In addition, HFH's CFO Joan E. Manning confirmed that there was "absolutely no need" to raise capital prior to FIRREA, nor had there been any communications or discussions about doing so. Similarly, HonFed's CFO Steven R. Ko testified that the reduction in HonFed's regulatory capital brought on by FIRREA was the "sole and exclusive cause of the Bishop [Estate] transaction." Finally, the fact that HonFed faced a more dire capital position in both 1987 and 1988 prior to the breach (with a negative tangible net worth of $58.768 million and $43.247 million, respectively) than it did in 1989 at the time the capital was raised (with a negative tangible net worth of $31.184 million) confirms the conclusion that the Bishop Estate transaction was proximately caused by the breach.[22]

---

**20.** In its post-trial brief, defendant makes the argument that the damages plaintiff seeks are not foreseeable in "magnitude and type" because HonFed had grown substantially larger than projected, forcing it to raise more capital than could have been foreseen in 1986 at the time of the contract's formation. The government clearly could have anticipated, however, that the breach of a contract to count supervisory goodwill toward HonFed's regulatory requirements would have caused plaintiff to raise additional capital in the marketplace and in so doing incur additional costs. *See Home Sav. of America, FSB v. United States*, 399 F.3d 1341, 1355 (Fed.Cir.2005) (rejecting the argument that the amount of capital required and the means by which it was raised were unforeseeable). We therefore deem defendant's argument regarding foreseeability without merit.

**21.** Plaintiff challenges the applicability of *CalFed* and its "but for" test of causation to the instant case, arguing that a lost profits claim (as was at issue in *CalFed*) is subject to a different standard of causation than the cost of cover claim put forward here. Plaintiff cites no authority for that proposition, however, and fails to offer a compelling explanation as to why cover damages, which by plaintiff's own estimation are a subset of expectancy damages, should be distinguished from lost profits, yet another subset of expectancy damages.

**22.** Nor do we believe that the various HonFed letters and documents upon which defendant relies support a different conclusion. In his March 28, 1989, memorandum to investor Preston Martin, for instance, HonFed's CEO Gerald M. Czar-

■ The same conclusion, we believe, applies to HonFed's retention of earnings. The record shows that HonFed would have been out of tangible capital compliance by more than $13 million and out of core capital compliance by $8 million as of September 20, 1990, had it not retained earnings during that period, leading us to conclude that FIRREA not only caused the thrift to retain earnings, but also made it unavoidable that it do so. The fact that HonFed had an irrefutable history of retaining earnings[23] does not change that conclusion: FIRREA transformed a discretionary business decision undertaken to grow the thrift into a mandatory measure required to save it. Significantly, HonFed would have been able, absent the breach, to use both its regulatory capital and its retained earnings, giving it two sources of valuable leverage.

Defendant argues, however, that even if the court were to find that HonFed would have had twice the leverage in a non-breach world, such a claim amounts to a suit for lost profits, an avenue plaintiff has opted not to pursue.[24] In addition, defendant contends that additional leverage possesses no actual value, an assertion it believes is bolstered both by the holding in *CalFed* and by the fact that HonFed maintained increasing levels of excess regulatory capital after the breach. As to the first point, defendant observes that the Federal Circuit in *CalFed* deemed the assertion that "leverage creates

wealth" a "fallacy." *CalFed,* 395 F.3d at 1271. As to the second point, defendant explains that while leverage enables a thrift to increase its borrowing, expanded borrowing is unprofitable where the cost of borrowing exceeds the return on additional assets. Because HonFed did not maximize its leverage after FIRREA, defendant urges the court to conclude that no additional opportunities to leverage were available and that HonFed therefore had reached the limits of its profitable borrowing.

Defendant's argument assumes too much. The fact that HonFed had not leveraged itself to its full capacity does not mean that having the wherewithal to do so was not a valuable commercial advantage. Nor does defendant's position account for the benefits a capital cushion can provide. *See Home Sav. of America, FSB v. United States,* 399 F.3d 1341, 1353 (Fed.Cir.2005) (describing a thrift's decision to maintain a substantial capital cushion a "successful business strategy" that "both appealed to [its] investors and helped [it] gain regulatory approval to acquire failing thrifts"); *Citizens Fed.,* 59 Fed. Cl. at 517 (observing that "[m]erely because [the thrift] maintained a cushion in excess of its mandatory capital requirements does not mean that [the thrift's] capital position was not compromised by the loss of goodwill and capital credits and therefore ultimately injured by their loss").

necki discussed the need for a capital infusion but did so only in the context of the impending FIRREA standards. Similarly, while HonFed's June 1989 business plan noted that HonFed's "on-going cost of funds will continue higher simply because we are undercapitalized," the report contemplated raising capital only in relation to the changes in capital requirements proposed by FIRREA.

23. In its five-year business plan drafted in 1986, HonFed projected dividends of only $1.8 million through 1992, with the remainder of its profits to be reinvested as retained earnings. In addition, HonFed's former CFO Robin Rudisill testified that even prior to FIRREA, the thrift had planned to increase its retained earnings in order to remain in compliance with the increasing capital requirements set forth in the contract. (Under the contract, HonFed was required to maintain a regulatory capital-to-total liabilities ratio of 2 percent in 1987, rising to 6 percent by 1996.)

Finally, Dr. Baxter himself calculated damages based on only about 70 percent of HonFed's post-breach retained earnings, presuming that the remaining 30 percent would have been retained by the thrift even in the absence of the breach.

24. Defendant's expert, Dr. Anjan Thakor, a professor of Finance and Economics at the Olin School of Business at Washington University in St. Louis, explained that the only value identified with goodwill is its ability to support additional lending, *i.e.,* its ability to be leveraged. He thus distinguished between ascertaining the *value* of goodwill (which he testified requires a lost profits model) and the *cost of replacing* goodwill (which he deemed zero based on the net present value theory described below). To the extent, then, that replacing the goodwill with tangible capital fully restored the leverage capacity of the excluded regulatory capital, Dr. Thakor concluded that the thrift suffered no injury.

In addition, defendant's assertion that additional leverage possesses no additional value is flatly contradicted by the Federal Circuit in *Home Savings,* 399 F.3d 1341. Although the *Home Savings* court acknowledged that *CalFed* had described the statement that "leverage creates wealth" a "fallacy," it maintained that *CalFed* "does not stand for the proposition that goodwill has no value." *Id.* at 1355 n. 8. Rather, the *Home Savings* court explained, *CalFed* should be read as standing for the proposition that "a bank is not certain to make profits from supervisory goodwill, and therefore that leverage does not 'create[ ] wealth' in that sense." *Id.*

Defendant's argument is similarly refuted by *LaSalle Talman Bank, FSB v. United States,* 64 Fed.Cl. 90 (2005), in which the government challenged the thrift's calculation of damages on the ground that it had failed to prove that it had paid any more in dividends as a result of the breach than it would have paid in the absence of the breach. The court concluded that "defendant's argument assumes that earnings are never retained to grow the institution. In the actual world, [the thrift's] opportunity to do so was reduced because the but-for thrift would not have had to pay the particular dividends that plaintiff is claiming, at least at the time they were paid." *Id.* at 110.

To the extent, then, that HonFed's retention of earnings was made necessary by the breach, we do not find the thrift's prior history of retaining earnings a bar to recovering the costs associated with them. As Dr. Baxter testified, HonFed could not have achieved capital compliance based on the Bishop Estate infusion alone; the retention of earnings was necessary to make up what otherwise would have been a $13 million tangible capital deficit in September 1990. We thus conclude that plaintiff has satisfied its burden of proving causation with respect to HonFed's retained earnings.

Nor do we accept defendant's assertion that damages are unavailable where HonFed ultimately profited from the recapitalization (and thus, in defendant's estimation, suffered no aggregate injury). The premise of plaintiff's claim is not, as defendant maintains, that raising tangible capital was ultimately harmful to HonFed. Rather, plaintiff's claim is predicated on the idea that HonFed incurred significant costs merely to "run in place," *i.e.,* return to its pre-breach status quo. As Dr. Baxter explained, the appropriate comparison in analyzing HonFed's injury is not the condition of the thrift immediately before and after recapitalization, but rather its condition prior to the government's breach versus its standing after its efforts at mitigation. While the possession of cash rather than goodwill was ultimately beneficial to HonFed, those benefits had attendant costs. Those costs, we believe, are certainly compensable.

### B. *Limiting Damages to Transaction Costs*

As to Dr. Baxter's calculation of plaintiff's costs, defendant mounts several challenges. As an initial matter, defendant contends that the damages associated with both the Bishop Estate transaction and the retention of earnings should be limited to transaction costs because, as a forward-looking matter, the costs incurred in both instances are directly balanced by the benefits received. Under this so-called "net present value zero" ("NPV zero") theory, defendant argues that a fair, arm's length exchange of securities for cash produces no net cost of capital because the price received for the stock represents the present value of the future dividends to be paid, so the benefit and the cost are equal.[25]

---

**25.** In further support of its position that damages are limited to transaction costs, defendant filed a notice of supplemental authority on April 27, 2005, calling the court's attention to the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo,* — U.S. —, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In defendant's view, no damages can be identified with the transfer of stock because, in the words of the *Dura Pharmaceuticals* Court, the cost of purchasing a share of stock is "as a matter of pure logic, ... offset by ownership of a share that possesses equivalent value at that instant." *Id.* at 1628. While we accept that statement in the context it was offered—that in a suit alleging securities fraud, an inflated stock price does not by itself demonstrate a causal connection between a material misrepresentation regarding the stock and a subsequent loss by a shareholder—we do not believe it adds anything new to the debate at issue here. Plaintiff has always acknowledged that the cash received by HFH and HonFed from the Bishop

Similarly, defendant maintains that whatever the projected cost of retaining earnings, the net cost, from an ex ante perspective, is zero because the benefits of retaining earnings directly match their costs.

Regardless of the validity of the NPV zero analysis as an economic principle, however, several courts have deemed it an unworkable tool in calculating *Winstar* damages. *See, e.g., Home Sav. of America, FSB v. United States*, 57 Fed.Cl. 694, 709 (2003) (adopting the view that the NPV zero method only addresses whether an investor receives from a corporation equal value for his investment and does not address the cost to the corporation for "accepting" the investment), *aff'd in relevant part*, 399 F.3d 1341, 1354 (Fed.Cir. 2005) (upholding the trial court's rejection of the argument that capital has no cost other than transaction costs); *LaSalle Talman Bank, FSB v. United States*, 45 Fed.Cl. 64, 105 (1999) (describing the NPV zero method as "a widely-used tool for assessing the viability of [an] investment" but noting that because it is "purely forward-looking" and "does not seek ... to calculate the sum of the payments [made] to investors," it has "no value as a tool for calculating damages for a breach of contract"), *aff'd in relevant part*, 317 F.3d 1363 (Fed.Cir.2003). The NPV zero analysis is particularly inappropriate in situations where, as here, the thrift has demonstrated costs it actually incurred. We thus see no reason to apply defendant's NPV zero theory when we have available to us HFH's and HonFed's real world costs in raising capital. *See, e.g., Fifth Third*, 402 F.3d at 1237 (rejecting a damages model that was "based entirely on hypothetical costs that were never actually incurred"); *LaSalle*, 317 F.3d at 1375 (rejecting an aspect of a damages model because it did not reflect "the actual experience" of the institution).

### C. Conflation of Ex Ante and Ex Post Damages Models

Our unwillingness to deny damages under the theory that the raising of capital carries no net costs prospectively brings us to defendant's second criticism of Dr. Baxter's approach—his conflation of an ex ante and ex post method for calculating damages. Defendant argues that Dr. Baxter cannot at once use dividends actually paid to measure the damages associated with the preferred shares (an ex post approach) and at the same time use a forward-looking cost of capital projection of 20 percent to calculate the cost of both the common shares and the retained earnings (an ex ante approach).[26] Consistency, in defendant's view, requires that the costs associated with the common stock and retained earnings also be calculated ex post, *i.e.*, based on the dividends paid.

Plaintiff argues, however, that the costs associated with retained earnings cannot be measured by the dividends HonFed paid out in the two and a half years before its sale to B of A because dividends approximate the cost of capital only over the long term. In plaintiff's view, the cost of retained earnings is instead reflected either in the expectation of a future return with which HonFed was burdened or, from HFH's perspective, in the dividends that the holding company did not receive. Plaintiff thus urges the court to assume a 20 percent cost of capital, a number based on Dr. Baxter's analysis of HonFed's efforts at capital raising and on market indicators more generally.

It is indeed commonly recognized that the return on an investment may take the form of dividends, capital appreciation, or a combination thereof. *See Duquesne Light Co. v. Barasch*, 488 U.S. 299, 312 n. 7, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). It is equally well-established that the capital costs of a business include service on the debt and

---

Estate was of equivalent value to the stock they issued to the Bishop Estate when the transaction is viewed in isolation. That observation does not, however, account for the fact that the stock issuance would not have been necessary in the absence of FIRREA.

**26.** Dr. Thakor expressed no preference as an economic matter for using either an ex ante or ex

post approach for calculating damages, maintaining only that the calculation under either approach needed to be consistent (*i.e.*, the costs identified under an ex ante model should be forward-looking and those calculated under an ex post model should take into account the institution's actual experience after the fact).

dividends on the stock. *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944). But while a corporation creates an expectation when it retains earnings that it will translate that investment into increased future dividends, an obligation incurred but not paid cannot be said to have a realized cost.[27] *See Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1371 (Fed.Cir.2005) (holding that obligations incurred, but not paid, on subordinated debt and preferred shares issued to finance plaintiff's acquisition of a defunct thrift do not constitute "amounts actually expended" and therefore do not qualify as a reimbursable component of reliance damages).

While we are sympathetic to plaintiff's objection that the ultimate cost of retained earnings is not fully reflected in the amount of dividends paid over the short term (particularly since the retention of earnings, almost by definition, means that dividends will not immediately be paid), we are unpersuaded that HonFed incurred costs above those that it paid out in dividends. During the two-and-a-half-year period between the breach of contract and the sale of HonFed to B of A, for example, the thrift recorded $90.802 million in retained earnings and paid out $1.9 million in dividends. It does not appear, from those figures, that HonFed paid a return of 20 percent on the earnings it retained. Nor can it be said that HonFed's shareholders (HFH and the Bishop Estate) were deprived of a return on those earnings—the Bishop Estate was paid $50 million for its preferred stock and $26.2 million for its 23 percent ownership interest in HFH representing a 30.98 percent rate of return on its original investment.[28]

With the exception, then, of the dividends paid, the retention of earnings cannot be said to harbor a cost borne by HonFed since the return ultimately came in the form of share appreciation (plaintiff admits that the retained earnings likely resulted in a dollar-for-dollar increase in the sale price), a value realized only upon the sale of the thrift to a third party. To the extent, then, that the purchase of the thrift by B of A curtailed HonFed's payment of dividends, any unrealized costs, we believe, were shouldered by B of A.

Nor can we accept plaintiff's argument that the Federal Circuit's decision in *Home Savings*, 399 F.3d 1341, mandates a different conclusion. In *Home Savings*, 57 Fed.Cl. at 723, the trial court awarded damages based in part on the amount of earnings a thrift would need to retain in the future in order to make up for the difference between the tangible capital it had already raised and the goodwill to which it was entitled. Consistent with the testimony given by the plaintiff's expert, the court employed the lowest-cost source of capital from the thrift's earlier capital raisings—a subordinated debt issue— as a proxy for what the existing shareholders would demand as a return on retained earnings. *Id.* at 715–16. On appeal, the Federal Circuit upheld the award of damages despite the fact the thrift and its corporate parent had, like HonFed and HFH, been sold between the time of breach and the date of trial, *id.* at 695 n. 2, and that the award was based on earnings to be retained in the future. Significantly, however, the Federal Circuit made no mention of retained earnings, and we are unwilling to infer strong support for a proposition that the court was not asked to address. We are especially reluctant to make such an inference when in a subsequent decision, that same court spoke directly to the issue of costs that, like the projected 20 percent cost of capital, are incurred only in theory: cover damages are

---

27. The parties' debate about the appropriate cost of capital further illustrates the difficulty of projecting the future payout of dividends. Although HonFed's retention of earnings created an expectation that it would pay out additional dividends, the obligation was an economic rather than a legal one and carried with it no explicit rate of return on the money borrowed. HonFed therefore was not bound to the theoretical cost of capital, but could instead have paid an amount higher or lower than the forecasted 20 percent.

28. In reaching this conclusion, we do not mean to suggest that a firm that pays no dividends in the short term has no cost of capital, only that those costs have essentially been deferred. In the instant case, the shareholders were afforded a return on their investment in the guise of a capital-enhanced bank, a gain that came at little or no cost to HonFed since it was only realized upon the sale of the thrift to B of A.

not available when "based entirely on hypothetical costs that were never actually incurred." *Fifth Third*, 402 F.3d at 1237. We thus conclude that the costs associated with HonFed's retention of earnings are limited to the dividends actually paid out and do not include hypothetical costs of capital that the thrift never realized.

We have similar reservations about identifying costs with the Bishop Estate that the thrift never actually incurred, specifically the $17.5 million associated with the HFH common stock. As an initial matter, the Bishop Estate's receipt of the common shares was not "free" as plaintiff contends, but was instead an integral part of an exchange of cash for stock. As Bishop Estate representative Mitchell Gilbert testified, the Bishop Estate would not have participated in the transaction in the absence of the ownership interest represented by the common shares. Similarly, HFH's CFO Joan E. Manning testified that without HFH's assumption of what she described as "the additional burden" of assuming payment of a cumulative 13 percent dividend on the entire $50 million, HonFed would not have been permitted to count the capital infusion toward equity. Nor, Ms. Manning explained, would the government regulators have allowed HonFed to pay dividends in excess of 8 percent. HonFed's CEO Gerald M. Czarnecki likewise described the conveyance of the equity interest as "a rather severe cost of getting the capital, but one that we had no choice but to live with." The transfer of the HFH common stock, in other words, was the contract term that enabled HonFed to pay what Dr. Baxter identified as below-market rates on its preferred shares. Indeed, Dr. Baxter explained the Bishop Estate transaction as follows:

> They had to structure something that the bank could afford, that would solve the capital problem, that the regulators would agree to, because they agreed to the payment of these dividends because they rec-

ognized the benefit of this transaction to them as well as to HFH and HonFed parties.... And that's why the common stock piece was put in, and that's why the preferred was structured so that they would get their money back through the preferred and they would get a fair return or a minimum return, not a market return—they would get their money back from the preferred, and they would get their upside through the common.

Dr. Baxter is thus incorrect in saying that HonFed could have sold the common shares elsewhere for $17.5 million; without those shares, it could not have generated the $50 million from the Bishop Estate.[29]

Plaintiff answers this concern by noting that the preferred shares included a condition (referred to by the parties as an "end-game feature") requiring that any third-party acquirer pay face value, or $50 million, for the preferred shares. As that condition was in fact met upon B of A's purchase of HonFed, Dr. Baxter maintained that the $50 million purchase price paid by the Bishop Estate is identifiable only with the preferred shares, thus confirming the correctness of the assertion that HFH was never compensated for its common stock. Dr. Baxter acknowledged, however, that the exercise of the end-game feature was not guaranteed and that, in any event, it would be exercised by someone other than HFH. (In the absence of a sale, HFH had no obligation to honor the end-game feature.) In addition, Dr. Thakor explained that the fact that the preferred stock would be redeemed at face value by a third party meant that the Bishop Estate would ultimately receive benefits for which HonFed and HFH incurred no costs. The price paid by the third party did not constitute a damage to HonFed and HFH, in other words, because the payment represented funds that never belonged to either HonFed or HFH.[30]

---

**29.** As defendant correctly notes, any injury HonFed suffered in giving away the $17.5 million in common stock "for free" was counterbalanced by the corresponding benefit of receiving $50 million in cash for what Dr. Baxter identifies as $32.5 million worth of preferred stock.

**30.** Dr. Baxter additionally failed to attach value to the end-game feature of the preferred stock while at the same time valuing the stock as perpetual. In so doing, Dr. Baxter undervalued the preferred stock (thereby overvaluing the common stock) and assumed away the condition critical to his calculation—the near-term redemption of the preferred shares.

It is of course possible to characterize the transfer of the common stock as a dilution in the ownership interest held by the Simon Group. The evidence indeed suggests that the Bishop Estate transaction was structured in such a way that the original shareholders voluntarily relinquished a portion of their interest in HFH so that a cash-strapped HonFed could pay a below-market rate in dividends while still attracting the necessary tangible capital. As Dr. Thakor pointed out, however, the "transfer from one group of shareholders [the Simon group] to another group of shareholders [the Bishop Estate] ex post ... is not damage to the institution." Nor can the Simon Group in their status as shareholders (*i.e.*, non-contracting parties) prosecute such a claim.[31] *FDIC v. United States*, 342 F.3d 1313, 1319–20 (Fed.Cir.2003) (holding that shareholders do not have standing where they were not signatories to the regulatory agreement nor third-party beneficiaries designated to be directly benefited); *Castle v. United States*, 301 F.3d 1328, 1338 (Fed.Cir.2002) (concluding that parties who are neither signatories to a regulatory assistance agreement nor the expressly intended beneficiaries of the contract independent of shareholder status do not have standing).

Dr. Baxter's model thus compensates plaintiff twice for the common shares—first by HonFed's receipt of $50 million ($17.5 million of which Dr. Baxter effectively identifies with the common stock) and second as a "cost" of raising the same $50 million in capital. It is indeed difficult to see how the exchange of common stock valued at $17.5 million for what essentially amounts to $17.5 million in cash can generate $17.5 million in compensable costs. This aspect of Dr. Baxter's model, therefore, must fail.

In rejecting Dr. Baxter's valuation of the HFH common stock, however, we do not mean to suggest that the conveyance of those shares came without a cost. We believe a much better way for calculating those costs is the approach proposed by Dr. Thakor—measuring the dividends actually paid by HFH on the common shares. This method has three distinct advantages over Dr. Baxter's model: it employs HonFed's and HFH's actual experience, it treats the preferred and common shares consistently, and it recognizes the Bishop Estate transaction as an integrated whole.[32]

### D. *The B of A Dividend*

While defendant generally supports the proposition that dividends represent a compensable cost of capital to an institution, it maintains that those costs are not recoverable where the institution itself did not ultimately make the dividend payment. Thus, because B of A, rather than HonFed or HFH, paid the Bishop Estate the final installment of the accumulated dividends in 1992, defendant urges that the $5.857 million in dividends paid by B of A must be subtracted from plaintiff's claim.

Plaintiff does not dispute that B of A paid the $5.857 million dividend. In plaintiff's view, however, this payment is analogous to a homeowner's using the proceeds of a real estate sale to pay off the outstanding mortgage on his property. The fact that the check is written by the buyer, plaintiff maintains, does nothing to change the fact that the mortgage obligation belongs to the original homeowner. Similarly, plaintiff argues, the fact that B of A paid the dividend does not alter the fact that the obligation for its payment belonged to HonFed and HFH.

The difficulty with plaintiff's analogy, defendant charges, is that it does not account for the Simon Group, whose costs are not recoverable. Because the Simon Group and the Bishop Estate were the entities selling HFH, defendant argues that B of A's payment reduced the proceeds of the Simon Group, thus making the Simon Group, and

---

**31.** It is additionally worthy of note that this approach was ultimately beneficial to the Simon Group because the cash infusion increased the value of their remaining 77 percent ownership interest and was critical in warding off HonFed's seizure.

**32.** Despite Dr. Baxter's testimony that dividends paid on common stock do not approximate the cost of capital in the short term, we are persuaded by Dr. Thakor's testimony that those dividends in fact represent the actual cost experienced by an institution from an ex post perspective.

not HonFed or HFH, the equivalent to the homeowner in plaintiff's analogy.

Dr. Thakor acknowledged, however, that HFH had an obligation to make the $5.857 million dividend payment to the Bishop Estate as of July 31, 1992, had the B of A acquisition not occurred.[33] To the extent, then, that B of A was discharging a debt owed by HonFed and HFH, we see no reason to distinguish the $5.857 million dividend payment from plaintiff's other costs.

### E. Recoverability of Transaction Costs

Equally recoverable in our view are the transaction costs associated with the Bishop Estate infusion. Of these costs, defendant challenges only three[34]—the $1.33 million in financial advisory fees paid to WSGP International, Inc., as excessive and as tantamount to a de facto dividend paid by HonFed to the Simon Group (two members of which were principals of WSGP); the $100,000 in accounting fees paid to the accounting firm of Kenneth Leventhal as having been paid by an entity other than HonFed or HFH (HonVest, a real estate subsidiary of HonFed); and the $1.09 million in financial advisory fees paid to Smith Barney on the grounds that the Smith Barney offering was never completed. In addition, defendant argues that each of these costs are unrecoverable because they would have been incurred even in the absence of the breach.

In each instance, however, we find defendant's arguments unavailing. OTS considered and rejected the claim that the $1.33 million fee paid to WSGP International was inappropriate and defendant has offered no additional evidence to undermine that finding. In addition, the fact that the $100,000 payment to Kenneth Leventhal was made by

HonFed's subsidiary was not well fleshed out at trial but is nevertheless insignificant: any fees paid by HonVest effected a decrease in the value of HonFed's investment in that subsidiary and thus represents an injury to the thrift. Cf. Afram Export Corp. v. Metallurgiki Halyps, S.A., 772 F.2d 1358, 1367 (7th Cir.1985) (allowing the calculation of cover damages based on sales by a commonly owned affiliate of the injured party). Finally, although the evidence presented at trial was inconclusive as to whether the proposed Smith Barney stock offering was voluntarily abandoned by HonFed or was rendered infeasible by market forces,[35] we subscribe to the view that any costs reasonably incurred to mitigate damages are recoverable, even if the effort to raise capital ultimately proved unsuccessful. Restatement (Second) of Contracts § 350 cmt. h (1981) (providing that "costs incurred in a reasonable but unsuccessful effort to avoid loss are recoverable as incidental losses"); Restatement (Second) of Contracts § 347 cmt. c (1981) (explaining that "[i]ncidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction"). Nor do we believe that the costs incurred in connection with the Bishop Estate transaction are duplicative of those undertaken for the abandoned stock issuance. To the contrary, the evidence shows that the efforts put forth on behalf of the latter significantly paved the way for the former.

In addition, we are unpersuaded by defendant's argument that the costs noted above would have been incurred irrespective of FIRREA. Although several of these expenses arose prior to the passage of FIRREA (e.g., the WSGP fees associated with

---

**33.** Dr. Thakor limited his testimony to financial issues and offered no opinion as a legal matter whether the dividend payment should properly be credited to HFH or B of A.

**34.** Defendant stipulates to the $400,000 in accounting fees paid to KPMG Peat Marwick LLP; the $460,000 in financial advisory fees paid to WSGP Financial Management Co.; the $940,000 in legal fees paid to Gibson, Dunn & Crutcher LLP; the $290,000 in printing fees paid to Pandick Press, Inc.; and the $367,000 associated with HFH's stock issuance.

**35.** James Cowles, the Smith Barney investment banker responsible for putting together the stock issuance, testified that he was confident that he could have completed the proposed public offering. HFH's CFO Joan E. Manning, HonFed's CEO Gerald M. Czarnecki, and original investor Roy Doumani all maintained, however, that the Bishop Estate transaction was pursued only after the Smith Barney offering was no longer an option.

the preparation of HonFed's 1989 business plan), the trial testimony demonstrated that the activities giving rise to these fees were undertaken in anticipation of the imminent breach and, as such, are compensable. *See Tennessee Valley Auth. v. United States*, 60 Fed.Cl. 665, 674 (2004) ("When it became obvious to [plaintiff] that [the government] would not perform under the contract, [plaintiff] was justified, indeed obligated, to take steps to minimize its losses in light of [the government's] imminent non-performance."). We thus conclude that plaintiff is entitled to the entirety of its $4.977 million claim to cover transaction costs arising from the Bishop Estate infusion.

### F. Identifying the Appropriate Offset

Having addressed the costs associated with the Bishop Estate transaction, we now turn to its corresponding benefits. In defendant's view, Dr. Baxter should not have employed HonFed's average cost of funds as an offset to the cost of dividends because it was implausible to assume that the proceeds of the Bishop Estate infusion would have been used to pay down the thrift's liabilities.[36] Dr. Baxter repeatedly testified, however, that he did not intend for the offset to reflect what HonFed actually did or would have done with the capital infusion, but rather to ensure that the investment of tangible capital did not expose HonFed to any greater risk than it had experienced with goodwill.[37] In explaining his position, Dr. Baxter observed that goodwill posed no risk to HonFed since it was guaranteed by the government and its value was certain. Its replacement, Dr. Baxter reasoned, therefore should be invested in something equally risk free. Dr. Baxter thus urged the court to adopt an offset based either on HonFed's average cost of funds or on the U.S. Treasury bill rate—rates, he testified, that carry with them risk profiles similar to the federally guaranteed goodwill.[38]

Dr. Thakor testified, however, that a thrift does not increase its risk simply by investing in additional assets and that it is therefore unnecessary to employ a risk-free rate to keep HonFed's risk profile constant. Similarly, defendant's expert Dr. William G. Hamm, an economist with experience testifying in *Winstar* litigation, testified that there is "no connection between the risk properties of regulatory capital and how the cash capital is used to build shareholder value," and, thus, that "it really doesn't matter what the risk profile is" in determining an appropriate offset.[39] Based on these views, defendant argues that the most reasonable offset is either the yield on interest-earning assets, a rate that would reflect the thrift's actual experience, or an offset based on a more realistic scenario than paying off core deposits—the repurchase of HonFed's costliest liability, its $40 million sub-debt.

In explaining defendant's second approach, Dr. Thakor presumed that HonFed would have used a portion of the capital raised through the Bishop Estate transaction to repurchase $20 million in sub-debt on which HonFed was paying the relatively high inter-

---

**36.** At trial, defendant ultimately acknowledged that Dr. Baxter's offset did not purport to represent the actual behavior of the thrift. Defendant continues to argue, however, that an offset based on HonFed's average cost of funds is tantamount to an assumption that the thrift would in fact have used the capital infusion to replace existing liabilities since the damages produced by the offset are the same.

**37.** As discussed above, tangible capital enjoys certain benefits over goodwill, in particular the ability to be invested to generate proceeds. As a theoretical matter, then, HonFed could have used its tangible capital to pay off existing liabilities (thereby saving itself the cost of those funds as envisioned by Dr. Baxter's model), invest in a low-risk instrument like government bonds (thereby receiving the Treasury bill rate), or in-

vest across the spectrum of its existing investment portfolio (thereby receiving the average yield on its earning assets).

**38.** Because core deposits (the largest component of HonFed's liabilities) and Treasury bills are both federally insured, Dr. Baxter explained that the two share the same level of risk and are thus virtually interchangeable. *See Home Savings,* 399 F.3d at 1354.

**39.** Dr. Hamm explained his reasoning by noting that a dollar of paid-in capital would remain on the balance sheet to be counted toward regulatory capital regardless of how that dollar was deployed. In that sense, Dr. Hamm argued, the cash infusion was no riskier an asset than was goodwill.

est rate of 13.5 percent (thereby saving $3.6 million annually). The remaining portion of the infusion, Dr. Thakor further posited, would have been invested in mortgage-backed securities (a relatively fluid and easily obtained financial instrument). Dr. Thakor thus identified the appropriate offset as consisting of the amount saved on the sub-debt plus the amount generated on the mortgage-backed securities.[40]

In determining which offset should be applied, we turn to the Federal Circuit's decision in *Home Savings*, 399 F.3d 1341. At the trial level, the court had chosen the intermediate term Treasury bond rate as an offset, explaining that the use of a "safe asset rate ... addressed the *cost*, not the proceeds, of capital raisings." *Home Sav.*, 57 Fed.Cl. at 723. On appeal, the Federal Circuit agreed that such a safe rate reflected the difference between what a thrift would have had to pay for government-backed deposits and the higher rate it actually paid for private market capital used to replace the disallowed goodwill. The Federal Circuit explained its reasoning as follows:

> A plaintiff's damages in a "cover" situation are discounted by "expenses saved as a result of [defendant's] breach." ... [T]he cash [plaintiffs] raised not only contributed to [the thrift's] regulatory capital, it substituted for cash that [the thrift] would otherwise have had to raise through deposits. [Plaintiffs] reaped an incidental benefit from this cash equal to the cost of the deposits they no longer had to obtain. Because deposits were guaranteed by the government, the court estimated their cost using the rate paid for a comparable government-backed asset, the intermediate-term Treasury bond. We agree with the Court of Federal Claims that this safe rate offset "account[s] for the difference between what was lost and what was substituted."

399 F.3d at 1354 (citations omitted).

While we do not believe that a safe rate is essential to keep HonFed's risk profile constant (for the reasons compellingly explained by Dr. Thakor and Dr. Hamm), we are persuaded by the various rationales in support of such an offset set forth in the two *Home Savings* decisions. We think it correct, as an initial matter, to characterize HonFed's efforts at capital raising as allowing the thrift to support its pre-breach asset portfolio, albeit at a higher cost of funds. Dr. Baxter's offset thus accounts for the increased price of doing business in a post-FIRREA world. In addition, Dr. Baxter's approach to the offset calculation focuses on the value with which we should properly be concerned—the cost saved by HonFed in making the substitute transaction. *See* Restatement (Second) of Contracts § 347 cmt. d (1981) ("Sometimes the breach itself results in a saving of some cost that the injured party would have incurred if he had had to perform.... This cost avoided is subtracted from the loss in value caused by the breach in calculating his damages.").

Nor do we believe, as defendant's approach would suggest, that the consequential benefits of the capital infusion, *i.e.*, how the money was ultimately invested, should be credited to the government. As the trial court in *Home Savings* explained, such an approach would "deprive[ ] [plaintiffs] of the benefit of their bargain ... if they had to offer back all the consequential profits they hoped to make by leveraging deposits proportionate to the new capital." 57 Fed.Cl. at 724. The *Home Savings* court went on to compare such an offset to a situation in which an injured party replaces an undelivered vehicle at a higher price but is entitled to no recovery because the vehicle would ultimately pay for itself through anticipated earnings. *Id.*

The same result, we believe, follows here. Although the Restatement advises that an injured party's damages are to be reduced if a smaller loss results from "an especially favorable substitute transaction," Restatement (Second) of Contracts § 347 cmt. e (1981), we do not understand it to endorse the crediting to the breaching party of the benefits obtained through the injured party's particular business savvy. Rather, the favorable substitution described in the Restatement is sufficiently captured by crediting the

---

**40.** In its capital plan of May 3, 1990, HonFed in fact contemplated the redemption of $20 million of its subordinated debentures but ultimately decided against pursuing such an approach.

breaching party with any favorable rate actually achieved in the substitute transaction, *e.g.*, a below-market rate used to attract replacement capital. Any additional benefit, *e.g.*, the profits owed to the injured party's business acumen unrelated to the breach, is not properly included as an offset. We thus conclude that Dr. Baxter's use of HonFed's average cost of funds accomplishes what the law requires: "some accounting for the difference between what was lost and what was substituted." *Home Sav.*, 57 Fed.Cl. at 723.

### G. *Failure to Account for the Benefits Associated With Tangible Capital*

Having accounted for the costs saved by HonFed's recapitalization, we turn next to the additional benefits for which defendant argues Dr. Baxter's damages model fails to provide. According to Dr. Thakor, Dr. Baxter improperly ignored many of the advantages associated with tangible capital—including the fact that it reduces risk and increases franchise value—thereby overestimating the thrift's costs and correspondingly inflating its damages. In support of this argument, Dr. Hamm testified that there are at least six important benefits a thrift realizes when it increases its tangible net worth:

> Number one, it improves its net interest margin; number two, it reduces its cost of borrowing and perhaps its cost of raising deposits; number three, it gains increased financial flexibility that gives it options to build shareholder value otherwise not available to it. Number four, it gets improved ratings from security analysts and improved valuations from the financial community. Number five, it increases the ability of the thrift to take advantage of opportunities that arise in the marketplace for enhancing shareholder value. And

number six, in a high-risk business like the thrift business, an increase in tangible capital increases the thrift's ability to absorb unexpected losses without creating for itself serious operational problems or destroying its viability.

In plaintiff's view, however, these alleged benefits were never realized by HonFed. Indeed, in each instance, defendant failed to demonstrate that such theoretical advantages were in fact enjoyed by HonFed or to quantify the effect they may have had on Dr. Baxter's damages model. We are thus unwilling, and in the absence of any quantification also unable, to account for such hypotheticals in assessing plaintiff's costs and benefits.

### H. *Recoverability of Wounded Bank Damages*

The final element of plaintiff's ex post damages calculation is its wounded bank damages. While HonFed certainly could have anticipated at the time of contract formation that it would need to replace its goodwill by raising tangible capital in the event of a breach, we do not believe that the costs associated with the failed First Nationwide branch acquisition (the forfeited escrow account and the equipment write-off) were equally foreseeable.[41] HonFed's CEO Gerald M. Czarnecki testified that he was confident, when he entered into the escrow obligation on October 16, 1989, that HonFed would be able to raise sufficient capital to facilitate the branch acquisition. The costs associated with HonFed's failure to do so by the March 31, 1990, deadline cannot be attributed to FIRREA since the commitment represented an additional obligation entered into nearly two months after the enactment of FIRREA and ten days after the breach.[42]

---

41. In its post-trial brief, plaintiff frames the issue of foreseeability by maintaining that damages were foreseeable if the government could or should have anticipated, at the time it entered into the contract with HFH, that a breach of regulatory capital forbearances and the disallowance of goodwill and sub-debt as regulatory capital would force HonFed and HFH to replace the capital at substantial cost. While we have no quarrel with this assertion per se, we do not believe it extends to the wounded bank damages discussed above.

42. During closing arguments, plaintiff additionally asserted that the escrow payments should be construed as a cost made necessary by the breach and incurred as an effort at mitigation. The evidence demonstrates, however, that the branch acquisition was a business opportunity pursued prior to and independent of FIRREA, preventing us from accepting plaintiff's characterization of that cost.

**596**

To the extent, then, that HonFed's obligation to pay the deposit arose after the breach, the loss of that money can neither be seen as having been within the contemplation of the parties at the time of contracting nor be deemed as having been proximately caused by the breach.[43]

The same cannot be said, however, for the costs associated with the creation of a new capital plan after the passage of FIRREA. These expenses were well within the contemplation of the parties at the time of contract formation; the need to formulate a capital plan in the wake of FIRREA was a direct and foreseeable consequence of the breach. We therefore conclude that the costs associated with a new capital plan are properly charged to defendant.[44]

## IV.

Having concluded that plaintiff is entitled to recover the costs associated with replacing its supervisory goodwill, we are left with one final issue—whether such damages should be subject to a tax gross-up to account for their potential taxability. In plaintiff's view, there is little doubt that any non-wounded bank damages awarded to B of A will be fully taxed, either as gross income or as a capital gain on an asset (*i.e.*, goodwill) that has no tax basis.[45] Plaintiff thus argues that a tax gross-up is necessary to return it to the position it would have been in absent the breach.

In support of its tax gross-up argument, plaintiff presented the testimony of Dean M. Fischbeck, the senior vice president of B of A with direct responsibility for tax compliance. Mr. Fischbeck testified that B of A's marginal tax rate for federal and state taxes for the last four years has been no less than 37.28 percent and that it is virtually certain, based on B of A's substantial annual income, that its marginal tax rate will remain at least at that level in the coming years. In addition, plaintiff maintains that the applicable tax rate can be calculated with a high degree of certainty since the 35 percent corporate tax rate has been in effect since 1993 and applies to all corporate taxable income in excess of approximately $18 million. From 1992 to 2004, B of A's lowest taxable income was in excess of $1.88 billion.

In response, defendant offered the testimony of Professor Paul A. Griffin of the Graduate School of Management at the University of California, Davis. In Professor Griffin's view, a tax gross-up is inappropriate here because the damages plaintiff seeks constitute the replacement of lost capital and as such will not be the subject of taxation. In support of his position, Professor Griffin noted that the IRS had denied B of A's claim to treat its lost goodwill as a deduction against taxable income. From that fact, Professor Griffin deduced that the replacement of the lost goodwill would not be taxable because "if the item is not a tax-deductible loss, symmetry says it would not be a tax-deductible gain." In addition, Professor Griffin argued that even if a tax gross-up were appropriate, the correct rate to be applied is not the tax rate to which B of A is subject but rather the rate applicable to HonFed and HFH.

The Federal Circuit upheld the award of such a tax gross-up in *Home Savings*, 399 F.3d at 1356, adopting the rule that "a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable" (citing *Oddi v. Ayco Corp.*, 947 F.2d 257, 267 (7th Cir.1991); *First Nationwide Bank v. United States*, 56 Fed.Cl. 438, 449 (2003); *LaSalle*, 45 Fed.Cl. at 110). In affirming that award, the court

---

**43.** Because we have disallowed the costs associated with the failed First Nationwide Bank acquisition, we need not reach defendant's argument that the branch acquisition would have been unsuccessful even in the absence of FIRREA, nor plaintiff's counter-argument that such an assertion is foreclosed by earlier holdings in this case.

**44.** Plaintiff also includes in its wounded bank damages claim costs associated with the unsuccessful Smith Barney stock issuance. For the same reasons we discuss above with respect to the transaction costs associated with the Bishop Estate infusion, we find that plaintiff is entitled to recover these costs.

**45.** According to plaintiff, the IRS disallowed B of A's attempt to claim a $100 million capital loss in connection with its disallowed goodwill on the grounds that the goodwill had no tax basis and that the loss had not occurred in 1995.

employed a clearly erroneous standard to test the legitimacy both of the trial court's finding that the award compensated the plaintiff for monies that would not have been taxable and of its determination of the applicable tax rate. Courts at the trial level, however, "generally do not gross-up damage awards to take into account the plaintiff's tax liability on the award unless a plaintiff can show with reasonable certainty that the gross-up is necessary to make plaintiff whole, the award will be subject to taxation and, for purposes of calculating the gross-up, that the award will be taxed at a certain rate." *Citizens Fed.*, 59 Fed.Cl. at 521. The *Citizens Federal* court rejected a similar gross-up claim on the ground that it was "too speculative ... because the Court does not know that the award will be taxed nor the rate at which it would be taxed." *Id.* at 522. The same reasoning, we believe, applies in the instant case.

While plaintiff has established with a fairly high degree of certainty the rate at which any proposed recovery would be taxed,[46] it made a far less convincing case for the proposition that any such recovery would be taxed at all. We are thus unwilling to enter an award for damages that may never in fact come due. Such an award would provide plaintiff a windfall.[47] *See generally* 3 E. Allen Farnsworth, Farnsworth on Contracts 193 (2d ed.1998) ("it is a fundamental tenet of the law of contract remedies that an injured party should not be put in a better position than had the contract been performed"). In addition, we think it premature to decide the question of whether plaintiff's damages award would indeed be treated as taxable income. Nothing would foreclose plaintiff, should its recovery in fact be taxed, from challenging that assessment in court where the trier of fact would have the benefit not only of full briefing but also of sums certain with regard to the amount of tax in question.

We therefore deny plaintiff's claim for a tax gross-up.

## CONCLUSION

■ In the final analysis, plaintiff maintains that HonFed was required to pay $44 million to raise $85 million, a proposition that we have great difficulty accepting. As discussed at length above, we believe that plaintiff's damages should instead be measured by the sum of the dividends paid on the common shares, the preferred shares, and the retained earnings, combined with the corresponding transaction and wounded bank costs, offset by any benefit conferred by the capital infusion (represented by HonFed's average cost of funds). The parties' damages models allow us to identify at least a portion of these costs: a net cost of $6.572 million associated with the payment of preferred dividends; $4.977 million in transaction costs; and $573,000 in allowable wounded bank damages. In order for the court to make the adjustments necessary to determine the remaining costs, the parties are directed to identify the dividends associated with the retained earnings and common shares and offset that amount by HonFed's average cost of funds consistent with this opinion.

Accordingly, on or before August 26, 2005, the parties shall file a joint calculation of damages consistent with this decision. Thereafter, the court will direct the Clerk to enter judgment in plaintiff's favor and to dismiss all remaining claims in these consolidated cases.

**46.** We are unable to accept defendant's claim that the relevant tax rate is the rate to which HonFed and HFH would have been subject and not the rate applicable to B of A when the precise point of the tax gross-up is to ensure that plaintiff—B of A—is made whole.

**47.** At trial, plaintiff's counsel offered personally to oversee the repayment to the United States Treasury of any sum in excess of that needed to meet B of A's eventual tax obligation, thereby avoiding the prospect of any windfall. While the court appreciates counsel's offer, we can think of no realistic way to implement it procedurally.